| Attorney or Party Name, Address, Telephone & FAX Numbers, State Bar Number & Email Address | FOR COURT USE ONLY |
|---|---|
| Baruch C. Cohen, Esq. (159455)<br>Law Office of Baruch C. Cohen, APLC<br>4929 Wilshire Boulevard, Suite 940<br>Los Angeles, CA 90010<br>Office (323) 937-4501 \| Cell (323) 353-9535<br>Facsimile: (888) 316-6107<br>Email: bcc@baruchcohenesq.com | |

☐ *Plaintiff(s) appearing without attorney*
☒ *Attorney for Plaintiff(s)*

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - **LOS ANGELES DIVISION**

| In re:<br><br>LESLIE KLEIN<br><br><br>Debtor(s). | CASE NUMBER: 2:23-bk-10990-SK<br><br>ADVERSARY NUMBER: 2:23-ap-01169-SK<br><br>CHAPTER: 11 |
|---|---|
| DAVID BERGER<br><br><br><br>Plaintiff(s),<br><br>vs.<br><br>LESLIE KLEIN<br><br><br>Defendant(s). | **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT UNDER LBR 7055-1**<br><br>DATE: 2/14/2024<br>TIME: 9:00 am<br>COURTROOM: 1575<br>ADDRESS: 255 E. Temple Street, Los Angeles |

**TO THE DEFENDANT, DEFENDANT'S ATTORNEY AND OTHER INTERESTED PARTIES:**

1. Name of Defendant(s) against whom default judgment is sought (*specify name*): LESLIE KLEIN

_____

2. Plaintiff filed the complaint in the above-captioned proceeding on (*specify date*): 06/09/2023

3. The Summons and Complaint were served on Defendant by    ☐ personal service    ☒ mail service
on the following date (*specify date*): 07/10/2023

4. A true and correct copy of the completed return of summons form is attached.

> *"Bankruptcy Code" and "11 U.S.C." refer to the United States Bankruptcy Code, Title 11 of the United States Code.*
> *"FRBP" refers to the Federal Rules of Bankruptcy Procedure. "LBR" and "LBRs" refer to the Local Bankruptcy Rule(s) of this court.*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2017*                    Page 1                    **F 7055-1.2.DEFAULT.JMT.MOTION**

5. The time for filing an answer or other response expired on (*specify date*): <u>08/22/2023</u>

     Defendant was later ordered to respond to the Complaint by 11-18-2023

6. No answer or other response has been filed or served by Defendant.

7. The default of Defendant:

     a. ☐ Has not yet been entered, but is requested

     b. ☒ Was entered on (*specify date*): <u>11/28/2023</u>

8. **A Status Conference:**

     a. ☒ Is scheduled for (*specify date, time, and place*): _____

          <u>12/20/2023 at 09:00 AM 255 E. Temple St. Courtroom 1575 Los Angeles</u>

     b. ☐ Was held on (*specify date, time, and place*): _____

          _____

9. As proof that Plaintiff is entitled to the relief requested in the complaint, Plaintiff:

     a. ☒ Relies on the complaint and attached documents.

     b. ☒ Attaches the following documents to establish a *prima facie* case:

          (1) ☒ Declaration of (*specify*): <u>David Berger</u>

          (2) ☐ Declaration of (*specify*): _____

          (3) ☐ Other (*specify*): _____

10. As further support for entry of a default judgment, Plaintiff submits a memorandum of points and authorities (optional).

11. **DECLARATION OF NON-MILITARY STATUS (**Servicemembers Civil Relief Act, 50 U.S.C. chapter 50 (§§ 3901-4043)).  The undersigned party or counsel declares under penalty of perjury, with respect to each Defendant against whom a default judgment is sought by this motion:

     a. ☒ Defendant is not currently in military service.  The facts that support this statement are as follows (*see the court's website for information about how to verify non-military status*):

     b. ☐ Defendant is currently in military service.  The facts that support this statement are as follows (*if this box is checked, the plaintiff must attach a supplement to this motion addressing the requirements in 50 U.S.C. § 3931(b)(2) to appoint an attorney for the Defendant before entering a judgment*):

     c. ☐ I am unable to determine whether or not Defendant is in military service.  The facts that support this statement are as follows (*if this box is checked, the plaintiff must attach a supplement to this motion addressing the bond requirement in 50 U.S.C. § 3931(b)(3)*):

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2017*                    Page 2                    **F 7055-1.2.DEFAULT.JMT.MOTION**

12. Defaulting party is not an infant or incompetent party.

Plaintiff requests that this court enter a default judgment in favor of Plaintiff.  A copy of the lodged proposed default judgment is attached.

Date: __12/19/2023__

Respectfully submitted,

Law Office of Baruch C. Cohen, APLC
Printed name of law firm

Signature

Baruch C. Cohen, Esq.
Name of Attorney for Plaintiff or Plaintiff

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2017                                    Page 3                          F 7055-1.2.DEFAULT.JMT.MOTION

# DECLARATION OF DAVID BERGER

I, **DAVID BERGER**, declare and state as follows:

1. The facts stated below are true and correct to the best of my personal knowledge and if called upon to testify to them, I could and would competently do so.

2. This Declaration is in support of the **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT UNDER LBR 7055-1** filed by me, David Berger.

## PROCEDURAL HISTORY

3. On 6-9- 2023, I filed this instant Complaint for Determination of Nondischargeability of Debts and to Deny Discharge pursuant to  11 USC § 523(a)(2)(A), 11 USC § 523(a)(4), & 11 USC § 523(a)(6); & for Denial of Discharge Pursuant to 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)("Complaint") against Defendant Leslie Klein ("Defendant"). (Dkt. No. 1) Adv. # 2:23-ap-01169-SK.

4. On 11-9-2023, the Court dismissed, without prejudice, causes of action for Denial of Discharge Pursuant to 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5) (Dkt No 38).

5. On 11-28-2023, this Court entered a default against Klein for Determination of Nondischargeability of Debts and to Deny Discharge pursuant to  11 USC § 523(a)(2)(A), 11 USC § 523(a)(4), & 11 USC § 523(a)(6) (Dkt No 43).

## BACKGROUND FACTS SUPPORTING JUDGMENT

6. On 2-17-2009, Leslie Klein ("Klein") on behalf of Leslie Klien & Associates, entered into a *Memorandum of Agreement for Joint Venture* (the "Gardner Memo").

7. On 2-17-2009, Klein on behalf of BK Life Settlements, LLC ("BK Life") entered into a *Life Insurance Policy Purchase Agreement* ("Gardner LIPPA") with Andrew and Yvette Gardner ("Gardner") for the purchase of two (2) $5,000,000.00 life insurance Policies #1625579 & #1621379 totaling $10,000,000.00 ("Gardner Policies") on the lives of Gardner. Klein designated Leslie Klien & Associates and myself as the sole beneficiaries of the Garner Policies. Klein had me sign the Gardner LIPPA on behalf of the buyer BK Life.

8. In furtherance of the <u>Gardner Memo</u>, I paid Klein $400,000.00 towards the purchase of the two <u>Gardner Policies</u>.

9. Per the <u>Gardner Memo</u>, Klein promised to pay me $5,000,000.00 upon the last Gardner to die.

10. Thereafter, Klein apparently sold portions or the entirety of the <u>Gardner Policy</u> to GMR Life Settlements LLC ("<u>GMR Life</u>") without my consent. Klein concealed this information from me.

11. Thereafter, on or about May of 2011, Klein apparently sold portions or the entirety of the <u>Gardner Policy</u> and to Life Capital Group, LLC ("<u>LCG</u>"), without my consent. Klein concealed this information from me.

12. According to information recently received by me, Klein and Shlomo Yehuda Rechnitz of LCG, agreed that upon the death of Gardner, Klein and Rechnitz would be reimbursed the premiums that they paid, plus interest on the premiums. Thereafter, Klein and Rechnitz would split the profits 50/50 of the <u>Gardner Policy</u>, and that I would receive my $5,000,000.00.

13. The Gardner's apparently died in 2021 - 2022, and Klein collected the <u>Gardner Proceeds</u>, on the <u>Gardner Policy</u>. Klein concealed this information from me, misappropriated & kept the <u>Gardner Proceeds</u> for himself, and failed to pay me the $5,000,000.00 per the <u>Gardner Memo</u>.

**INTEREST CALCULATION**

14. Pursuant to Bankruptcy Rule 3001(c)(2)(A), interest of 10% on the $5,000,000.00 from 2-17-2009 until the petition date of 2-22-2023 came to $7,010,958.834 (5118 days at $1,369.8630/day). The total amount due as of the filing date was $12,010,958.834.[1]

15. Post-petition interest continues to accrue at the rate of $1,369.8630/day. The total post-petition interest from 2-23-2023 through 12-19-2023 (299 days) comes to $409,589.037. **<u>The total amount due as of 12-19-2023 is $12,511,547.871</u>**.

---

[1]A true and correct copy of the Amended Proof of Claim which was filed in the main case on 12/19/2023, incorporates copies of the <u>Gardner LIPPA</u> and the <u>Limited Liability Company Agreement of Life Capital Group, LLC,</u> is attached hereto as Exhibit "1" and is incorporated herein by this reference.

1        I declare under penalty of perjury under the laws of the United States, State of California that

2    the foregoing is true and correct.

3        Executed December 19, 2023, at Los Angeles CA.

4                                                By ____/s/ David Berger_____
                                                    DAVID BERGER
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Baruch C Cohen<br>4929 Wilshire Blvd Ste 940<br>Los Angeles, CA 90010<br><br>323-937-4501<br><br><br><br><br><br>*Plaintiff or Attorney for Plaintiff* | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES

| In re:<br><br><br>Leslie Klein<br><br><br><br>Debtor(s). | CASE NO.:  2:23-bk-10990-SK<br><br>CHAPTER:  11<br><br>ADVERSARY NUMBER: 2:23-ap-01169-SK |
|---|---|
| David Berger<br><br><br>Plaintiff(s)<br>Versus<br><br>Leslie Klein<br><br><br>Defendant(s) | **ANOTHER<br>SUMMONS AND NOTICE OF STATUS<br>CONFERENCE IN ADVERSARY<br>PROCEEDING [LBR 7004–1]** |

TO THE DEFENDANT(S): A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper–hand corner of this page. The deadline to file and serve a written response is **08/07/2023.** If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

 A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Date:** | **September 6, 2023** |
| **Time:** | **09:00 AM** |
| **Hearing Judge:** | **Sandra R. Klein** |
| **Location:** | **255 E Temple St., Crtrm 1575, Los Angeles, CA 90012** |

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016–1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court–approved joint status report form is available on the court's website (LBR form F 7016–1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016–1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date of Issuance of Alias Summons and Notice of Status Conference in Adversary Proceeding: July 7, 2023

By: _____ "s/" Thais D. May _____

Deputy Clerk



---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                    Page 2                    **F 7004–1.SUMMONS.ADV.PROC**

## EARLY MEETING OF COUNSEL, JOINT STATUS REPORT AND STATUS CONFERENCE INSTRUCTIONS

1.      A copy of these instructions must be attached to the copy of the complaint served upon each party, and the proof of service of the summons and complaint must indicate that such copy was served therewith.

2.      If the adversary proceeding involves money or property exceeding $10,000, or if plaintiff believes trial time will exceed 4 hours, plaintiff must serve, with the summons and complaint, a notice that compliance with Local Bankruptcy Rule 7026-1 and Federal Bankruptcy Procedure Rule 7026 is required.  Plaintiff must also file a proof of service of the notice together with the proof of service of the summons and the complaint.

3.      If Local Bankruptcy Rule 7026-1 is applicable, counsel for the parties <u>MUST TIMELY MEET TO DISCUSS SETTLEMENT AND TO EXCHANGE DOCUMENTS, OTHER EVIDENCE, AND LISTS OF WITNESSES, AND PRELIMINARY DISCOVERY SCHEDULES AS PROVIDED IN SAID RULE.  FEDERAL RULE OF CIVIL PROCEDURE 26(f) DOES NOT APPLY TO THIS PROCEEDING.</u>

4.      Unless all defendants have defaulted, the parties **must** file a Joint Status Report pursuant to Local Bankruptcy Rule 7016-1(a)(2) at least 14 court days before the date of the status conference using Local Form No. F 7016-1.1.  This form may be found on the Court's website, www.cacb.uscourts.gov, by clicking on "Forms/Rules/General Orders," then "Local Bankruptcy Rules & Forms," and scrolling down to F 7016-1.1.  If Local Bankruptcy Rule 7026-1 is applicable, <u>the parties shall include in the Joint Status Report a statement that they have met to discuss settlement and have exchanged documents, other evidence, lists of witnesses and preliminary discovery schedules</u>.

5.      If no response to the complaint is timely filed, plaintiff may request entry of default by the clerk or by the court pursuant to Local Bankruptcy Rule 7055-1(a).  Plaintiff may also request entry of a default judgment by filing and serving an appropriate motion pursuant to Local Bankruptcy Rule 7055-1(b).  These motions may be brought pursuant to Local Bankruptcy Rule 9013-1.

6.      If the parties dispute whether the adversary proceeding is "core" or "non-core," they must file points and authorities in support of their positions.  See 28 U.S.C. § 157.  Any party that contends the proceeding is "non-core" must file and serve its points and authorities at least 14 days before the status conference.  Any response must be filed and served at least 7 days before the status conference.

7.      Unless a party objects in writing in the first Joint Status Report or the court orders otherwise, direct testimony at trial will be presented by declaration.

8.      Failure to comply with these instructions may subject the responsible party to sanctions.

9.      At the initial status conference a date may be set for further status conference, a pre-trial conference and/or for trial.

10.     Failure of counsel for any party to appear at a status conference or pre-trial conference may be considered an abandonment and the adversary proceeding may be dismissed or judgment entered against the defaulting party, without further hearing.

Sandra R. Klein
United States Bankruptcy Judge

Baruch C. Cohen, Esq. (SBN 159455)
LAW OFFICE OF BARUCH C. COHEN
   A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010
Tel: (323) 937-4501   Fax:  (888) 316-6107
email: baruchcohen@baruchcohenesq.com

*Attorney For Plaintiff David Berger*

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES ANA DIVISION

| In re | Case No. 2:23-bk-10990-SK |
|---|---|
| LESLIE KLEIN, | Hon.  Sandra Klein |
| Debtor and Debtor in Possession, | Chapter 11 |
| DAVID BERGER, | **COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO  11 USC § 523(a)(2)(A), 11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)** |
| Plaintiff | |
| vs. | |
| LESLIE KLEIN | |
| Defendant | |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY
JUDGE, THE DEBTOR AND HIS COUNSEL, AND ALL OTHER INTERESTED
PARTIES**:

     Plaintiff-Creditor, David Berger ("Plaintiff"), complain for nondischargeability of debt &
for denial of discharge against Defendant-Debtor, Leslie Klein ("Defendant"), and allege
respectfully as follows:

**CORE/NON-CORE DESIGNATION**

1.    In accordance with Local Bankruptcy Rule 7008-1, Plaintiff alleges that this adversary
proceeding constitutes a core proceeding under 28 USC § 157(b)(2). Plaintiff
acknowledges that the Court has the power to enter final orders and judgments in this

1    matter. Plaintiff also consents to the Court's entry of final orders and judgments in this

2    matter under FRBP Rule 7008.

3                    **JURISDICTION, VENUE & STANDING**

4    2.    This adversary proceeding arises under *In re Klein*, 2:23-bk-10990-SK, a Chapter 11 case

5        commenced in the United States Bankruptcy Court for the Central District of California

6        ("Bankruptcy Case"). The Court has jurisdiction under 11 USC §§ 523 and 727, and 28

7        USC §§ 157 and 1334.

8    3.    The venue is proper in this Court pursuant to 28 USC § 1409.

9    4.    Plaintiff have standing to bring this action because Plaintiff is a(n omitted) creditor in the

10       Bankruptcy Case under 11 USC § 101(10).

11                            **PARTIES**

12    5.    The following is a description of the relevant parties involved in the facts forming the

13        basis of this Complaint.

14    6.    Plaintiff is an individual, residing in Los Angeles County.

15    7.    Defendant is an individual, whose principal residence is in Los Angeles County,

16        California and who regularly conducted business from Los Angeles County, California.

17        Defendant was a certified public accountant, formerly licensed by the State of California,

18        and a former, and an attorney licensed by the State of California.[1] Defendant is the debtor

19        in the above-captioned Chapter 11 bankruptcy case.

20                  **GENERAL ALLEGATIONS**

21    8.    The following general allegations form the background for the Plaintiff's claims for relief

---

[1] On September 10, 1992, the Supreme Court of the State of California, in State Bar Court Case No. 86-O-14258, ordered that Defendant be suspended from the practice of law for 18 months and further ordered that he take and pass the California Professional Responsibility Examination ("CPRE"). Defendant failed the November 1993 and January 1994 CPREs. In Case No. 86-O-14258, Defendant admitted to intentional misrepresentations. On August 3, 1995, the Supreme Court of the State of California, in State Bar Court Case No. 92-O-11716 (consolidated with Case Nos. 93-O-11825, 94-O-13951, 94-O12055, and 94-O15901) ordered that Defendant be suspended from the practice of law for one year. In Case No. 92-O-11716, as consolidated, Defendant admitted to willful violations of Rules of Professional Conduct concerning client trust accounts and conflicts of interest.

1    against Defendant.

2    9.    Defendant was the Plaintiff's friend and neighbor for more than 55 years.

3    10.   Plaintiff did not receive timely notice of this bankruptcy proceeding as the Debtor

4    omitted listing Plaintiff on his Schedule F - general unsecured creditors.

5    11.   On 2-17-2009, Leslie Klein ("Klein") on behalf of Leslie Klien & Associates, entered

6    into a *Memorandum of Agreement for Joint Venture* with Plaintiff (the "Gardner

7    Memo").

8    12.   On 2-17-2009, Klein on behalf of  BK Life Settlements, LLC ("BK Life") entered into a

9    *Life Insurance Policy Purchase Agreement* ("Gardner LIPPA") with Andrew and Yvette

10   Gardner ("Gardner") for the purchase of two (2) $5,000,000.00 life insurance Policies

11   #1625579 & #1621379 totaling $10,000,000.00 ("Gardner Policies") on the lives of

12   Gardner. Klein designated Leslie Klien & Associates and Plaintiff as the sole

13   beneficiaries of the Garner Policies. Klein had Plaintiff sign the Gardner LIPPA on

14   behalf of the buyer BK Life.

15   13.   In furtherance of the Gardner Memo, Plaintiff paid Klein's IOLTA account with his law

16   firm, Leslie Klien & Associates, $400,000.00 towards the purchase of the two Gardner

17   Policies.

18   14.   Per the Gardner Memo, Klein promised to pay Plaintiff $5,000,000.00 upon the last

19   Gardner to die.

20   15.   On or about 11-16-2015, Klein wrote to Plaintiff:

21   Dear David: You are right. We have been friends for the last fifty years and I
     would not do anything that would adversely affect your interest in the Gardner
22   policy.

23   16.   Thereafter, Klein apparently sold portions or the entirety of the Gardner Policy to GMR

24   Life Settlements LLC ("GMR Life") without Plaintiff's consent. Klein concealed this

25   information from Plaintiff.

26   17.   Thereafter, on or about May of 2011, Klein apparently sold portions or the entirety of the

27   Gardner Policy and to Life Capital Group, LLC ("LCG"), without Plaintiff's consent.

28

Klein concealed this information from Plaintiff.

18.    According to information recently received by Plaintiff, Klein and Shlomo Yehuda

Rechnitz of LCG, agreed that upon the death of Gardner, Klein and Rechnitz would be

reimbursed the premiums that they paid, plus interest on the premiums. Thereafter, Klein

and Rechnitz would split the profits 50/50 of the Gardner Policy, and that Plaintiff would

receive his $5,000,000.00.

19.    The Gardner's apparently died in 2021 - 2022, and Klein collected the Gardner Proceeds,

on the Gardner Policy. Klein concealed this information from Plaintiff, misappropriated

& kept the Gardner Proceeds for himself, and failed to pay Plaintiff the  $5,000,000.00

per the Gardner Memo.

20.    Pursuant to by Bankruptcy Rule 3001(c)(2)(A), interest of 10% on the $5,000,000.00,

since 2-17-2009 (1565 days at $1,369.8630 interest per day) comes to $2,143,835.62,

bringing the total amount due at **$7,143,835.62**.

21.    During this entire time, Defendant repeatedly assured Plaintiff that premiums of the

Gardner Policy were being timely made, and that his investment in the Gardner Policy

was secure and accruing interest.

**PLAINTIFF'S DISCOVERY OF DEFENDANT'S FRAUD**

22.    On or about 7-29-2022, Plaintiff discovered the above-referenced frauds and

concealment.

**FIRST CLAIM FOR RELIEF**
**(Nondischargeability of Debt - 11 USC § 523(a)(2)(A))**

23.    Plaintiff realleges and incorporates by reference all of the prior and subsequent

allegations in this Complaint as though fully set forth herein.

24.    At all relevant times, Defendant acted as Plaintiff' fiduciary - investment adviser.

Plaintiff entrusted Defendant implicitly with his investment in the Gardner insurance

policies.

25.    Defendant owed Plaintiff fiduciary duties at all relevant times, including the duty of

loyalty and candor. Defendant further owed a duty to use Plaintiff' funds for legitimate

-4-

business purposes and to refrain from using their funds and other property for his own personal non-business purposes.

26.    Defendant embezzled and stole from Plaintiff. Defendant misrepresented the above-referenced information to Plaintiff for the purpose of convincing Plaintiff to invest in the Gardner Policy into Defendant's IOLTA client trust account. Defendant then stole more than $400,000.00 of Plaintiff' money in a complicated life insurance scam, constituting intentional fraudulent, fraudulent concealment, and breach of fiduciary duty.

27.    Defendant's misappropriation of Plaintiff's funds and other property was unauthorized, without his consent and fraudulent. Defendant acted with the intent to permanently deprive Plaintiff of the possession, use and benefit of their funds and other property.

28.    As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiff' funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, Plaintiff have suffered damages in the amount of not less than $7,143,835.62.

29.    Defendant's debt to Plaintiff is nondischargeable under 11 USC § 523(a)(2) because it was incurred as a result of false pretenses, false representations, and actual fraud.

30.    The damages arising from Defendant's willful and malicious false pretenses, false representation and actual fraud to Plaintiff constitutes a debt against Defendant that is nondischargeable pursuant to 11 USC § 523(a)(2)(A).

**SECOND CLAIM FOR RELIEF**
**(Nondischargeability of Debt - 11 USC § 523(a)(4))**

31.    Plaintiff realleges and incorporates by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

32.    At all relevant times, Defendant acted as Plaintiff' fiduciary - investment adviser. Plaintiff entrusted Defendant implicitly with his investments in the Gardner insurance policies.

33.    Defendant owed Plaintiff fiduciary duties at all relevant times, including the duty of loyalty and candor. Defendant further owed a duty to use Plaintiff' funds for legitimate

1   business purposes and to refrain from using their funds and other property for his own

2   personal non-business purposes.

3   34.   Defendant embezzled and stole from Plaintiff. Defendant misrepresented the above-

4   referenced information to Plaintiff for the purpose of convincing Plaintiff to invest in the

5   Gardner Policy into Defendant's IOLTA client trust account. Defendant then stole more

6   than $400,000.00 of Plaintiff' money in a complicated life insurance scam, constituting

7   intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse.

8   35.   Defendant's misappropriation of Plaintiff' funds and other property was unauthorized,

9   without his consent and fraudulent. Defendant acted with the intent to permanently

10  deprive Plaintiff of the possession, use and benefit of his funds and other property.

11  36.   As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiff'

12  funds and other property and Defendant's false pretenses, false representations, and

13  actual fraud set forth herein, Plaintiff have suffered damages in the amount of not less

14  than $7,143,835.62.

15  37.   The damages to Plaintiff arising from Defendant's fraud, defalcation, embezzlement and

16  larceny while acting in a fiduciary capacity constitutes a debt against Defendant that is

17  non-dischargeable pursuant to 11 USC § 523(a)(4).

18  **THIRD CLAIM FOR RELIEF**
19  **(Nondischargeability of Debt - 11 USC § 523(a)(6))**

20  38.   Plaintiff realleges and incorporates by reference all of the prior and subsequent

21  allegations in this Complaint as though fully set forth herein.

22  39.   At all relevant times, Defendant acted as Plaintiff' fiduciary - investment adviser.

23  Plaintiff entrusted Defendant implicitly with their investments in the insurance policies.

24  40.   Defendant owed Plaintiff fiduciary duties at all relevant times, including the duty of

25  loyalty and candor. Defendant further owed a duty to use Plaintiff' funds for legitimate

26  business purposes and to refrain from using his funds and other property for his own

27  personal non-business purposes.

28  41.   Defendant embezzled and stole from Plaintiff. Defendant misrepresented the above-

-6-

referenced information to Plaintiff for the purpose of convincing Plaintiff to invest in
Gardner policies into Defendant's IOLTA client trust account. Defendant then stole more
than $400,000.00 of Plaintiff' money in a complicated life insurance scam, constituting
intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse.

42.  Defendant's misappropriation of Plaintiff' funds and other property was unauthorized,
without his consent and fraudulent. Defendant acted with the intent to permanently
deprive Plaintiff of the possession, use and benefit of their funds and other property.

43.  As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiff'
funds and other property and Defendant's false pretenses, false representations, and
actual fraud set forth herein, Plaintiff have suffered damages in the amount of not less
than $7,143,835.62.

44.  The damages to Plaintiff arising from Defendant's willful and malicious injury to
Plaintiff constitutes a debt against Defendant that is non-dischargeable pursuant to 11
USC § 523(a)(6).

**FOURTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(2)(A))**

45.  Plaintiff realleges and incorporates by reference all of the prior and subsequent
allegations in this Complaint as though fully set forth herein.

46.  Plaintiff is informed and believes that within one year before the Petition, Defendant
transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or
concealed, Defendant's property.

47.  As of the dates of the transfers, removals, and/or concealments of Defendant's property,
Defendant had one or more unsecured creditors.

48.  The transfers, removals, and/or concealments of Defendant's property prevented the
distribution of Defendant's property to Defendant's unsecured creditors.

49.  Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's
creditors, including, without limitation, Plaintiff, transferred, removed, and/or concealed,
or permitted to be transferred, removed, and/or concealed, Defendant's property.

50. By transferring, removing, concealing, and/or permitting the transfer, removal, and/or concealment of Defendant's property with the intent to hinder, delay, and/or defraud at least one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(A).

51. Defendant failed to list valuable property on his schedule of assets and failed in his statement of affairs to disclose property transfers.

52. Defendant has a reckless indifference to the truth.

**FIFTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(2)(B))**

53. Plaintiff realleges and incorporates by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

54. Plaintiff is informed and believes that After the Petition, Defendant transferred, removed, concealed, and/or permitted to be transferred, removed, and/or concealed, property of the Bankruptcy estate.

55. As of the dates of the transfers, removals, and/or concealments of the property of the estate, Defendant had one or more unsecured creditors.

56. The transfers, removals, and/or concealments of the property of the estate prevented the distribution of this property to Defendant's unsecured creditors.

57. Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's creditors, transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or concealed, property of the estate.

58. By transferring, removing, concealing, and/or permitting the transfer, removal, and/or concealment of estate property, with the intent to hinder, delay, and/or defraud at least one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(B).

59. Defendant failed to list valuable property on his schedule of assets and failed in his statement of affairs to disclose property transfers.

60. Defendant has a reckless indifference to the truth.

///

///

**SIXTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(3))**

61.　Plaintiff realleges and incorporates by reference all of the prior and subsequent

allegations in this Complaint as though fully set forth herein.

62.　Plaintiff is informed and believes that Defendant has not maintained adequate books and

records from which Debtor's financial condition can be ascertained. Debtor has

consistently not maintained adequate books and records. His failure to keep adequate

books and records is not justified considering the circumstances articulated in this

Complaint.

63.　Defendant has concealed, destroyed, falsified, and/or failed to keep or preserve

information from which Defendant's financial condition and/or business transactions

might be ascertained.

64.　Defendant has not been cooperative with the Office of the United States Trustee

("OUST") or with his creditors. Defendant has intentionally withheld records, books,

documents, and/or other papers relating to Defendant's property and/or financial affairs.

65.　Considering the foregoing, Defendant's discharge must be denied under 11 USC §

727(a)(3).

**SEVENTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(4))**

66.　Plaintiff realleges and incorporates by reference all of the prior and subsequent allegations

in this Complaint as though fully set forth herein.

67.　Plaintiff is informed and believes that Defendant has not made simple isolated errors or

omissions in his Bankruptcy filings. Defendant's filings, such as his schedules and

statement of affairs, do not reflect inadvertence or incompetence; rather, they exhibit

fraudulent intent.

68.　Defendant has a pattern of misleading conduct.

69.　Defendant has a reckless indifference to the truth.

70.　Defendant has failed to list assets in his schedules.

71.   Defendant has falsely testified in the 341 Meeting.[2]

72.   Defendant has knowingly and fraudulently made false oaths and/or accounts in the Bankruptcy Case.

73.   Defendant has failed to provide records which are necessary for the OUST and his creditors to properly understand Defendant's financial condition and/or recent business transactions.

74.   Considering the foregoing, Defendant's discharge must be denied under 11 USC § 727(a)(4).

**EIGHTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(5))**

75.   Plaintiff realleges and incorporates by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

76.   Defendant has failed to explain satisfactorily his deficiency and/or loss of assets to meet Debtor's liabilities. No determination has yet been made of an entitlement to a discharge in this Bankruptcy Case.

77.   Considering the foregoing, Defendant's discharge must be denied under 11 USC §  727(a)(5).

---

[2] At the 3-13-2023 341(a) Meeting, Defendant at circa 11:15 testified in response to omissions to be brought to the attention of the United States Trustee ("UST"), that there were only "three minor errors" which he thought that his attorney corrected. Defendant testified that there were "no" errors related to any assets that he owns. At circa 12:52, Defendant testified that he identified all assets on his schedules. Defendant at circa 1:18:30-1:09:21 testified that in the year before the Bankruptcy, he received no commissions from his third-party life insurance deals. At circa 1:20:18, Defendant testified that he has not ever collected money on his third-party life insurance deals. At circa 1:22:18, Defendant testified that he has never received a payoff on his third-party life insurance deals. At circa 1:23:21, Defendant testified that four people have died and that he has received no money. Defendant at circa 1:39:00 testified, in response to whether he had transactions with Shlomo Rechnitz in the last five or six months relating to the thirdparty life insurance policies, "nope." Defendant testified that he does not remember paying the premiums for these policies out of his attorney client trust account at any time. Defendant at circa 1:40:03 testified that he does not remember depositing his own funds into his attorney-client trust account so that these insurance premiums could be paid. In response to the question of whether Defendant traveled out of the country anywhere recently, other than Israel, Defendant at circa 2:23:00 testified, "nope." In response to the question of whether Defendant has bank accounts in Israel, Defendant at circa 2:26:48 testified, "nope." Defendant at circa 2:59:15 testified that he has not transferred any assets within the last year to a third party. Defendant at circa 2:59:33 testified that he has not given any gifts more than $12,000.00 to his family.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff request judgment on the Complaint as follows:

1.  On the First Claim for Relief, Plaintiff seek an order determining that Defendant is indebted to Plaintiff in an amount not less than $7,143,835.62 and that Defendant's debt is excepted from discharge pursuant to 11 USC § 523(a)(2)(A);

2.  On the Second Claim for Relief, Plaintiff seek an order determining that Defendant is indebted to Plaintiff in an amount not less than $7,143,835.62 and that Defendant's debt is excepted from discharge pursuant to 11 USC § 523(a)(4);

3.  On the Third Claim for Relief, Plaintiff seek an order determining that Defendant is indebted to Plaintiff in an amount not less than $7,143,835.62 and that Defendant's debt is excepted from discharge pursuant to 11 USC § 523(a)(6);

4.  On the Fourth Claim for Relief,  Plaintiff seek an order denying Defendant his discharge pursuant to 11 USC § 727(a)(2)(A);

5.  On the Fifth Claim for Relief,  Plaintiff seek an order denying Defendant his discharge pursuant to 11 USC § 727(a)(2)(B);

6.  On the Sixth Claim for Relief,  Plaintiff seek an order denying Defendant his discharge pursuant to 11 USC § 727(a)(3);

7.  On the Seventh Claim for Relief,  Plaintiff seek an order denying Defendant his discharge pursuant to 11 USC § 727(a)(4);

8.  On the Eighth Claim for Relief,  Plaintiff seek an order denying Defendant his discharge pursuant to 11 USC § 727(a)(5);

9.  For costs of suit incurred herein; and

10. For such other and further relief as the Court may deem appropriate.

DATED:        June 9, 2023              LAW OFFICE OF BARUCH C. COHEN
                                        A Professional Law Corporation

                                        By ___/S/ Baruch C. Cohen_____
                                        Baruch C. Cohen, Esq.
                                        *Attorney For Creditor David Berger*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

4929 Wilshire Boulevard, Suite 940, Los Angeles, California 90010.

true and correct copy of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004–1]** and (2) the accompanying pleading(s) entitled:
EARLY MEETING OF COUNSEL, JOINT STATUS REPORT AND STATUS CONFERENCE INSTRUCTIONS,  and  COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO  11 USC § 523(a)(2)(A), 11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005–2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 7/10/2023_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Baruch C Cohen (PL)          bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
Michael I. Gottfried (IP)      mgottfried@elkinskalt.com, cavila@elkinskalt.com, lwageman@elkinskalt.com, docketing@elkinskalt.com
Nikko Salvatore Stevens (IP)   nikko@cym.law, mandi@cym.law
United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov

☐  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) 7/10/2023_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Leslie Klein, 322 N. June Street, Los Angeles, CA 90001

☐  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 7/10/2023_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Hon. Sandra R. Klein, 255 E. Temple Street, Suite 1582, Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/10/2023 | Baruch C Cohen | /s/ Baruch Cohen |
|-----------|----------------|------------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016

**F 7004–1.SUMMONS.ADV.PROC**

**EXHIBIT "1"**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | LESLIE KLEIN |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 2:23-bk-10990-SK |

## Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

DAVID BERGER

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

BARUCH C. COHEN, ESQ.
Name

4929 WILSHIRE BOULEVARD, SUITE 940
Number     Street

LOS ANGELES     CA     90010
City     State     ZIP Code

Contact phone  323-937-4501

Contact email  baruchcohen@baruchcohenesq.com

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number     Street

_____
City     State     ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.  Claim number on court claims registry (if known) 35

Filed on 06/05/2023
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  <u>B</u>  <u>E</u>  <u>R</u>  <u>G</u>

**7. How much is the claim?**

$ <u>12,010,958.83</u>   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>KLEIN MISAPPROPRIATED INSURANCE POLICY PROCEEDS</u>

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**   _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                           $_____

**Amount of the claim that is secured:**        $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12/19/2023
MM / DD / YYYY

/s/ Baruch C. Cohen, Esq.
Signature

**Print the name of the person who is completing and signing this claim:**

| | | |
|---|---|---|
| Name | Baruch C. Cohen | |
| | First name    Middle name | Last name |
| Title | ATTORNEY FOR DAVID BERGER | |
| Company | LAW OFFICE OF BARUCH C. COHEN, APLC | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 4929 WILSHIRE BOULEVARD, SUITE 940 | |
| | Number    Street | |
| | LOS ANGELES | CA    90010 |
| | City | State    ZIP Code |
| Contact phone | 323-937-4501 | Email baruchcohen@baruchcohenesq.com |

## DECLARATION OF DAVID BERGER

I, **DAVID BERGER**, declare and state as follows:

1.  The facts stated below are true and correct to the best of my personal knowledge and if called upon to testify to them, I could and would competently do so.

2.  This Declaration is in support of the **PLAINTIFF'S AMENDED PROOF OF CLAIM** filed by me, David Berger.

3.  I did not receive timely notice of this bankruptcy proceeding as the Debtor omitted listing me on his Schedule F - General Unsecured Creditors.

4.  On 2-17-2009, Leslie Klein ("Klein") on behalf of Leslie Klien & Associates, entered into a *Memorandum of Agreement for Joint Venture* (the "Gardner Memo").

5.  On 2-17-2009, Klein on behalf of BK Life Settlements, LLC ("BK Life") entered into a *Life Insurance Policy Purchase Agreement* ("Gardner LIPPA") with Andrew and Yvette Gardner ("Gardner") for the purchase of two (2) $5,000,000.00 life insurance Policies #1625579 & #1621379 totaling $10,000,000.00 ("Gardner Policies") on the lives of Gardner. Klein designated Leslie Klien & Associates and myself as the sole beneficiaries of the Garner Policies.[1] Klein had me sign the Gardner LIPPA on behalf of the buyer BK Life.

6.  In furtherance of the Gardner Memo, I paid Klein $400,000.00 towards the purchase of the two Gardner Policies.

7.  Per the Gardner Memo, Klein promised to pay me $5,000,000.00 upon the last Gardner to die.

8.  Thereafter, Klein apparently sold portions or the entirety of the Gardner Policy to GMR Life Settlements LLC ("GMR Life") without my consent. Klein concealed this information from me.

9.  Thereafter, on or about May of 2011, Klein apparently sold portions or the entirety of the Gardner Policy and to Life Capital Group, LLC ("LCG"), without my consent.[2] Klein

---

[1] A true and correct copy of the Gardner LIPPA is attached hereto as Exhibit "1" and is incorporated herein by this reference.

[2] A true and correct copy of the Limited Liability Company Agreement of Life Capital Group, LLC is attached hereto as Exhibit "2" and is incorporated herein by this reference.

1    concealed this information from me.

2    10.    According to information recently received by me, Klein and Shlomo Yehuda Rechnitz of

3           LCG, agreed that upon the death of Gardner, Klein and Rechnitz would be reimbursed the

4           premiums that they paid, plus interest on the premiums. Thereafter, Klein and Rechnitz would

5           split the profits 50/50 of the <u>Gardner Policy</u>, and that I would receive my $5,000,000.00.

6    11.    The Gardner's apparently died in 2021 - 2022, and Klein collected the <u>Gardner Proceeds</u>, on

7           the <u>Gardner Policy</u>. Klein concealed this information from me, misappropriated & kept the

8           <u>Gardner Proceeds</u> for himself, and failed to pay me the $5,000,000.00 per the <u>Gardner Memo</u>.

9                                     **INTEREST CALCULATION**

10   12.    Pursuant to Bankruptcy Rule 3001(c)(2)(A), interest of 10% on the $5,000,000.00 from

11          2-17-2009 until the petition date of 2-22-2023 comes to $7,010,958.834 (5118 days

12          at $1,369.8630 interest per day). The total amount as of the filing date was **$12,010,958.834**.

13

14          I declare under penalty of perjury under the laws of the United States, State of California that

15   the foregoing is true and correct.

16          Executed December 19, 2023, at Los Angeles CA.

17                                     By ____/s/ David Berger_____
18                                           DAVID BERGER

19

20

21

22

23

24

25

26

27

28

12/19-1:00pm

**EXHIBIT "1"**

## LIFE INSURANCE POLICY PURCHASE AGREEMENT

This PURCHASE AGREEMENT (the "Agreement") is entered into as of the 17th day of February, 2009 by and among **BK LIFE SETTLEMENTS, LLC** (together with its successors and assigns, the "Buyer"), and **ANDREW GARDNER and YVETTE GARDNER Irrevocable Life Insurance Trust** the Owner of the Policy (the "Seller") and **ANDREW GARDNER and YVETTE GARDNER** (the "Insured").

## DEFINITIONS

"Assignment Effective Date" shall mean, the date that the Insurer (or other appropriate entity) unconditionally transfers the ownership interest in the Policy from the Seller/Insured to the Buyer.

"Beneficiary" shall mean the person or entity entitled to receive the benefits payable pursuant to the terms of the Policy.

"Escrow Agent" shall mean **LESLIE KLEIN & ASSOCIATES.**

"Escrow Agreement" shall mean the agreement entered into in conjunction with the Agreement between the Buyer and the Escrow Agent to provide escrow services.

"Insurer" shall mean, the insurance company that issued the Policy that is subject of the Agreement, or any successor, as set forth in Exhibit A.

"Lien" shall mean all liens, security interests, claims, charges, restrictions and encumbrances.

"Owner" shall mean the owner of the Policy wishing to sell that Policy, who is also the insured under the Policy.

"Party" or "Parties" shall mean the person or persons that are subject to the Agreement.

"Person" shall mean army natural person.

## BACKGROUND

The Seller/Insured wishes to sell a certain life insurance policy, including all

Seller/Insured Initial _____
Buyer Initial _____

benefits, riders and endorsements thereto (the "Policy"), as more fully defined in Exhibit A, for a cash payment and the Buyer is willing to purchase the Policy subject to the terms, conditions and representations contained herein. Certain capitalized terms used herein are defined above, while others are defined within the text of the Agreement or the documents delivered herewith.

**NOW, THEREFORE**, in consideration of and in reliance on the mutual covenants and representations contained in the Agreement, and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Buyer and the Seller/Insured (the "parties" and individually a "Party") hereby agree as follows, intending to be legally bound:

## 1.   ASSIGNMENT OF POLICY

The Seller/Insured hereby sells, assigns and transfers to the Buyer or its nominee as of the Assignment Effective Date, all right, title and interest in and to the Policy, free and clear of all Liens, which assignment and transfer shall include, but not be limited to, the rights to:

(i)     Change the Beneficiary on the Policy;

(ii)    Assign or surrender the Policy;

(iii)   Borrow on the Policy;

(iv)    Apply for and maintain waiver of premiums under or conversion of the Policy; and

(v)     Receive notification regarding any and all matters relative to the Policy as to which the Seller/Insured may or should be notified.

Effective as of the Assignment Effective Date, the Seller/Insured (a) irrevocably designates **LESLIE KLEIN & ASSOCIATES and DAVID BERGER** as the sole Beneficiary of the Policy and (b) relinquishes and assigns to the Buyer all rights the Seller/Insured has to, arising out of or in connection with the Policy.

The Seller/Insured shall promptly deliver to the Escrow Agent:

(i)     The executed original of the Agreement and all complete, fully executed Related Documents:

Seller/Insured Initial _____

Buyer Initial _____

(ii)     The originals of any other fully executed forms or written authorizations necessary or desirable to effect a change in both the Beneficiary designation and the ownership of the Policy as contemplated by the Agreement; and

(iii)    Such other information and documentation as the Buyer shall reasonably request.

1.4     Upon receipt of the documentation described in Section 0, the Escrow Agent shall promptly forward to the Insurer, in form and substance satisfactory to the Buyer, documentation as may be required for the insurer to transfer ownership of the Policy and change the Beneficiary designation as contemplated by Section -2 of the Agreement.

1.5     The Buyer shall cause the purchase price as set forth in Exhibit A (the "Purchase Price") to be delivered to and deposited with the Escrow Agent along with documents in Paragraph 1.4. The Escrow Agent will hold the Purchase Price in a financial institution that is a member of the Federal Deposit Insurance Corporation (the "FDIC"), where such proceeds shall remain until acknowledgment of the transfer by the Insurer.

1.6     In the event the acknowledgment is not received within thirty (30) days of taking the action required by Section 1.4. the Seller/Insured, in conjunction with the Buyer or in accordance with its instructions, will directly contact the insurer to attempt to have the Insurer issue the acknowledgment.

1.7     The Buyer is not obligated to direct the release of the Purchase Price by the Escrow Agent and may terminate the Agreement without further obligation to the Seller/Insured in the event that:

(i)     The Insurer refuses with or without sufficient reason, to change the ownership or the Beneficiary designation as contemplated by the Agreement;

(ii)     The Buyer reasonably believes that any representation, by the Seller/Insured contained in the Agreement or any related document is false;

(iii)    The Buyer is unable to obtain financing due to incomplete or inaccurate information supplied by the Seller/Insured; or

(iv)    Any condition of Section 0 has not been satisfied or waived in writing by the Buyer.

Upon such termination by the Buyer, the Buyer may request the Escrow Agent to

Seller/Insured Initial ____
Buyer Initial ____

return the Purchase Price to the Buyer and the documentation described in Section 0 to the Seller/Insured and the Escrow Agent shall do so promptly.

I.8     Subject to Sections 1.7 and **0** of the Agreement, the Escrow Agent shall pay, $400,000.00 pursuant to the Escrow Agreement, the purchase Price to the Seller/Insured within two (2) business days following the latter of:

(i)     Receipt by the Escrow Agent of written acknowledgment from the Insurer that (a) ownership of the policy has been transferred and (b) the Beneficiary designation has been changed as contemplated by the Agreement, and

(ii)    Verification by the Buyer of any information deemed necessary or desirable, including each representation of the Seller/Insured.

1.9     Following the Assignment Effective Date, the Buyer will be responsible for all payment of premiums on the Policy and will be entitled to all proceeds of the Policy including but not limited to the death benefit, cash value and dividends.

## 2.     COVENANTS AND REPRESENTATIONS OF THE SELLER/INSURED

The Seller/Insured represents to the Buyer:

(i)     That the Seller/Insured is the sole and undisputed Owner of the policy;

(ii)    The face amount of and net death benefit payable under the Policy, as well as other information relating to the policy set forth in Exhibit A, is correctly set forth in Exhibit A;

(iii)   The benefits under the Policy, including any portion of the death benefits, are incontestable, as set forth in the incontestable section of the Policy and there are no facts or circumstances in existence as of the date hereof which could serve as a defense to payment by the Insurer upon death of the Seller/Insured.

**(iv)   At all times after the transfer, the Seller/Insured will account for and report, on its books and records, in relevant disclosure documents filed with regulatory or administrative bodies or in documents made available to the public or third parties, with respect to each transferred Policy, as assets that have been sold by it to an unaffiliated third party;**

(v)     There are no Liens on the Policy;

(vi)     Nothing prohibits or restricts the Seller/Insured from executing the Agreement, transferring the ownership of the Policy or changing the Beneficiary designation as contemplated by the Agreement and, the Seller/Insured has the full right and authority to do so;

(vii)    There are no restrictions on transfer of the Policy;

(viii)   There have been no unpaid premiums on the Policy;

(ix)     The Policy is in full force and effect and has not lapsed, and the Seller/Insured thereof had an insurable interest at the time the Policy was first issued;

(x)      All of the information contained in any document delivered to the Buyer is true, complete and correct; none of such information, any representation by the Seller/Insured contained herein or otherwise made to the Buyer, contained any untrue statement of material fact, or omitted to state a material fact necessary to make such information or representation not misleading in light of the circumstances under which any said statement was made;

(xi)     No representation by the Seller/Insured or any other person or entity contained in any application for the Policy, or otherwise made to the Insurer, contained any untrue statement of material fact, or omitted to state a material fact necessary to make such representation not misleading in light of the circumstances under which any such statement was made; and

(xii)    The Seller/Insured does not have a catastrophic or life-threatening illness or condition.

The Seller/Insured covenants to and agrees with the Buyer:

(i)      That the Seller/Insured shall pay all premiums prior to the Assignment Effective Date as they become due;

(ii)     That the Seller/Insured shall take all actions from time to time that may be necessary or desirable in the Buyer's discretion, including executing all such documents as may be required by the Buyer or the Insurer to complete the transfer of ownership and change the Beneficiary designation of the Policy as contemplated by the Agreement, and the Seller/Insured shall cooperate in any way requested by the Buyer from time to time to assist the Buyer in keeping the Policy in force;

Seller/Insured Initial _____
Buyer Initial _____

(iii) That upon the request of the Buyer, but not more often than once every thirty (30) days if the Seller/Insured has a life expectancy of one (1) year or less, and no more than once every three (3) months if the Seller/Insured has a life expectancy of more than one (1) year, and within ten (10) days of such request, the Seller/Insured shall cause releases and authorizations to be executed from time to time, permitting or authorizing the Buyer to obtain current medical information regarding the Seller/Insured; and

(iv) That the Seller/Insured shall inform the Buyer within thirty (30) days of any and all changes in personal information of the Seller/Insured, including address, telephone number, employment status, or attending physician information. The Seller/Insured acknowledges that the Buyer may, from time to time but not more often than every thirty (30) days if the Seller/Insured has a life expectancy of one (1) year or less, and no more often than once every three (3) months if the Seller/Insured has a life expectancy of more than one (1) year, contact the Seller/Insured (or the Seller/Insured's Designee) for confirmation of such information.

## 3    COVENANTS OF THE BUYER

The Buyer covenants to and agrees with the Seller/Insured:

(i) That the Buyer shall maintain medical. information concerning the Seller/Insured in confidence, subject to applicable law, disclosure contemplated. by the Agreement or Related Documents, including the Medical Records Release, and reasonable requirements of the Buyer's business;

(ii) That the Seller/Insured will not be required to pay any advance fees or bear any costs related to the purchase of the Policy unless otherwise noted in Exhibit A; and

(iii) That the Buyer shall be responsible for and shall pay all, premiums on the Policy after the Assignment Effective Date.

## 4.    CONDITIONS PRECEDENT

The Agreement will not be binding upon the Buyer until the following conditions have been satisfied or waived in writing by the Buyer:

(i) The Agreement, along with the Related Documents, in each case in form and substance satisfactory to the Buyer, must be received and accepted by the Buyer at

Seller/Insured Initial
Buyer Initial

its executive office and be further executed, if applicable, by an authorized officer of the Buyer;

(ii)     There shall not be any pending action, proceeding or governmental action, and there shall not have occurred any change in law or regulation, or interpretation of the same, which challenges, seeks to avoid or otherwise places in question the validity of the transactions contemplated by the Agreement;

(iii)    There shall not be any insolvency, reorganization or like proceedings commenced or threatened against, by or involving the Seller/Insured, or the Insurer; and

(iv)     The credit rating of the insurer shall not have been downgraded for any reason.

**IT IS UNDERSTOOD THAT THE BUYER IS UNDER NO OBLIGATION TO PURCHASE THE POLICY AT THE PURCHASE PRICE UNTIL THE ASSIGNMENT EFFECTIVE DATE. NOTWITHSTANDING THE FOREGOING, IF THE BUYER DIRECTS THE ESCROW AGENT TO RELEASE THE PURCHASE PRICE TO THE SELLER/INSURED, THE FOREGOING CONDITIONS SHALL BE DEEMED SATISFIED OR WAIVED.**

**5.        NOTICES**

Any notice required or permitted hereunder must be given in writing to the party to be notified either by personal delivery, guaranteed overnight courier or facsimile, and shall be deemed effectively given (I) in the case of personal delivery, upon delivery to the party to be notified, (ii) in the case of delivery by overnight courier, on the date of delivery guaranteed by such overnight courier, or (iii) in the case of notice by facsimile, upon telephone confirmation of receipt by the party to be notified. Any such notice shall be addressed to the relevant party at the address given below or to such other address as such party has given to the other parties hereto in the manner specified in this Section 0.

            Seller/Insured:      **GARDENER Irrevocable Life Insurance Trust**

            Buyer:               **BK LIFE SETTLEMENTS, LLC**

Seller/Insured Initial ____
Buyer Initial ____

6.    **SUBSEQUENT CONTACT REGARDING HEALTH STATUS;
SELLER/INSURED'S DESIGNEE**

Upon execution of the Agreement, the Buyer shall have the right to contact the Seller/Insured or the Seller/Insured's Designee to determine and monitor the health status of the Seller/Insured. The Buyer may contact the Seller/Insured no more often than once every thirty (30) days if the Seller/Insured has a life expectancy of one (1) year or less and no more often than once every three (3) months if the Seller/Insured has a life expectancy of more than one (I) year. Within ten (10) days of such request, the Seller/Insured shall cause releases and authorizations to be executed from. time to time, permitting or authorizing the Buyer to obtain current medical information regarding the Seller/Insured.

The Seller/Insured may designate any individual of legal age, in regular contact with the Seller/Insured, as a contact for inquiries about the Seller/Insured's health status, upon written notice providing the name, address and telephone number of the individual (the "Seller/Insured's Designee"). the Seller/Insured may change a designation at any time upon written notice to the Buyer.

If the Seller/Insured makes a designation of any individual as provided in Section 0, a life settlement provider, provider representative, or broker shall not contact the Seller/Insured for health status information about the seller/Insured, unless the life settlement provider, provider representative, or broker is unable, after diligent effort, to contact the Seller/Insured's Designee for more than thirty (30) days, subject to the restrictions set forth in Section 0.

No life settlement provider, provider representative, or broker shall contact the Seller/Insured or the Seller/Insured's Designee to determine the Seller/Insured's health status. more frequently than once every thirty (30) days if the Seller/Insured has a life expectancy of one (1) year or less, and no more often than once every three (3) months if the Seller/Insured has a life expectancy of more than one (1) year.

The Buyer shall provide to the Seller/Insured, the name, address, and telephone number of the life settlement provider, provider representative, or broker that will contact the Seller/Insured or the Seller/Insured's Designee, and shall notify the Seller/Insured of any change in such information.

Seller/Insured Initial ___
Buyer Initial ___

## 7.    POST SALE OBLIGATIONS

By entering into the Agreement, the Seller/Insured agrees to fulfill the continuing obligation to cooperate to the fullest extent possible with the Buyer until such time as the death benefit is paid to the designated Beneficiary, with respect to all matters concerning the Policy and the Agreement, including but not limited to:

(i)     Assist the Buyer to maintain the Policy in full force.

(ii)    Provide current contact information such as residence address, phone number and e-mail address in the event of any changes with respect to any of that information provided to the Buyer,

(iii)   Complete additional paperwork in connection with the Policy, as needed, and

(iv)    Provide updates and records as to the Seller/Insured's medical status or condition, including to assist the Buyer in obtaining the Seller/Insured's current medical records.

If the Policy is a group insurance policy, the Seller/Insured will maintain that policy status unless otherwise instructed by us, which such instructions the Seller/Insured shall follow, and the Buyer may also request information regarding the Policy, including but not limited to the Seller/Insured's employment status, from the Seller/Insured or the Seller/Insured's Designee, from the Insurer, or from the group policyholder. The Seller/Insured shall:

(i)     Notify the Buyer of any change in employment status, including but not limited to retirement, notice of termination or application for short or long-term disability or re-certification of disability status;

(ii)    Direct any employer or policyholder to promptly respond to any request for information necessary to maintain the coverage provided in force; and

(iii)   Assign or re-assign the group life insurance contract to the Buyer if the Policy reverts to the Seller/Insured, for any reason.

Seller/Insured Initial _____
Buyer Initial _____

## 8.    RIGHT TO RESCISSION

The Seller/Insured has the right to rescind the Agreement within fifteen (15) days after the date that the Seller/Insured executes the Agreement, as evidenced by the date of the signature of the notary evidencing the signature of the Seller/Insured. If the Seller/Insured rescinds the Agreement, then the Seller/Insured must immediately return any of the Purchase Price received from the Buyer, if any, in connection herewith.

If the Seller/Insured deceases during this rescission period, then the Agreement shall be deemed rescinded, subject to the Buyer receiving all of the Purchase Price and premiums, loans, loan interest or other amounts paid by the Buyer in connection with the Agreement.

Upon rescission of the Agreement by the Seller/Insured and the receipt by the Buyer of all of the Purchase Price paid by the Buyer, if any, in connection with the Agreement, our rights and interests in the Policy will terminate, the Company will cause such forms as are necessary to execute a change of ownership to be filed with the Insurer, to designate reversion of Policy ownership to the Seller/Insured (or to the estate of the Seller/Insured if the Seller/Insured is then deceased), and the Seller/Insured then, as owner of the Policy, may designate beneficiaries under the Policy.

## 9.    RULES OF CONSTRUCTION

All words used herein shall be construed to be of such gender or number as the circumstances require. The words "herein", "hereby", "hereof", "hereto", "hereinbefore", and "hereinafter", and words of similar import, refer to the Agreement in its entirety and not to any particular paragraph, clause or other subdivision, unless otherwise specified. Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of the Agreement. Except as otherwise expressly provided in the Agreement, the following rules of interpretation apply to the Agreement: (i) "or" and "any" are not exclusive and "include" and "including" are not limiting; (ii) a reference to a law includes any amendment or modification to such law and any rules or regulations issued, thereunder; (iii) a reference to a person or entity includes its successors and permitted assigns; (iv) each reference to a determination, judgment, approval or consent to be made or given by the Purchaser shall be made or given by the Purchaser in its sole discretion and in good faith; (v) a reference in the Agreement to an Article, Section, Annex, Exhibit or Schedule is to the Article, Section, Annex, Exhibit or Schedule of the Agreement; and (vi) "U.S. dollars" or "dollars" or "$" or "US$" refer to lawful currency of the United States of America.

Seller/Insured Initial _____
Buyer Initial _____

**10.        MISCELLANEOUS**

The Agreement, together with the Related Documents, constitutes the entire understanding and agreement between the Parties, and supersedes any and all prior or contemporaneous representations, understandings and agreements between the Parties with respect to the subject matter of the Agreement, all of which are merged in the Agreement.

All amendments to or modifications of the Agreement shall be binding upon the Parties, despite any lack of consideration, so long as such amendments or modifications shall be in writing and executed by all Parties. No person, other than an executive officer of the Buyer, has the authority to change the Agreement or to waive any of its provisions. In the absence of fraud, all statements made by the Seller/Insured and the Buyer shall be deemed representations and not warranties.

In the event that any portion of the Agreement is found invalid or unenforceable pursuant to judicial decree or decision, the remainder of the Agreement shall remain valid and enforceable according to its terms and such portion shall be reformed and interpreted so that it is enforceable to the maximum extent permitted by law.

The Seller/Insured shall not have any right to assign or transfer the Agreement or any rights, duties or obligations of the Seller/Insured under the Agreement, and the Agreement may not be involuntarily assigned or transferred by the Seller/Insured by operation of law, without the prior written consent of the Buyer, which consent may be granted or withheld by the Buyer in its sole discretion. Any attempted assignment or transfer without such consent shall he null and void. The Buyer shall have the right to assign the Agreement or the Policy, including all rights, benefits and obligations hereunder, in its sole and absolute discretion, to a person unknown to the Seller/Insured, without notice to or consent from the Seller/Insured or any other person.

Except as provided in Section 0, it is not the intention of the Agreement or the Parties to confer a third party beneficiary right of action upon any third party or entity whatsoever, and nothing set forth in the Agreement shall be construed so as to confer upon any third party or entity other than the Parties a right of action under the Agreement or in any manner whatsoever.

All disputes and controversies of every kind and nature between the Parties to the Agreement arising out of or in connection with the Agreement including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance or termination thereof shall be submitted and settled by arbitration in accordance with the rules of the American

arbitration Association.  The arbitration shall be held in California before a panel of three (3) arbitrators, hereafter referred to as "arbitrator", knowledgeable in the business of life insurance, one to be chosen by each party, and the third to be chosen by the two previously chosen arbitrators. The arbitrator's decision and award shall be final and binding and may be entered in any court having jurisdiction thereof. The arbitrator shall not have the power to award punitive, exemplary or consequential damages.  No party may bring a claim or action, regardless of form, arising out of or related to the Agreement more than one year after the cause of action accrues. The laws of the State of California shall govern the Agreement, without regard to conflicts of law provisions.

Failure to insist upon strict compliance with any of the terms, conditions or representations of the Agreement shall not be deemed a waiver of such terms, conditions or representations.

The Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

**NEITHER THE BUYER., NOR ANY REPRESENTATIVE, IS OFFERING LEGAL OR TAX ADVICE IN CONNECTION WITH THE SALE OF LIFE INSURANCE POLICY(S) DESCRIBED IN THIS DOCUMENT.  THE SELLER/INSURED AGREES THAT HE/SHE HAS SOUGHT INDEPENDENT ADVICE FROM A QUALIFIED TAX PROFESSIONAL OR THAT HE/SHE HAS DECIDED NOT TO SEEK SUCH ADVISE. THE SELLER/INSURED SHOULD SEEK PERSONALIZED ASSISTANCE FROM A TAX OR ESTATE PLANNING ATTORNEY, AND OTHER QUALIFIED FINANCIAL PROFESSIONAL IN HIS/HER STATE OF RESIDENCE, WHEN CREATING AND COMPLETING ANY TAX OR ESTATE PLAN, SUCH AS THIS TRANSACTION.**

**IN WITNESS WHEREOF,** the Parties have executed the Agreement on the date first above written.

*SIGNATURES APPEAR ON THE FOLLOWING PAGE*

Seller/Insured Initial _____
Buyer Initial _____

**BK LIFE SETTLEMENTS, LLC**

_____
**Signature of the Buyer**
**DAVID BERGER**

_____
**Signature of the Seller/Insured**
**The GARDNER Irrevocable Life**
**Insurance Trust**

_____
**YVETTE GARDNER**

_____
**ANDREW GARDNER**

| | |
|---|---|
| **STATE OF CALIFORNIA** | ) |
| | )   **ss** |
| **COUNTY OF LOS ANGELES** | ) |

On _____ 2009, before me, _____, a
Notary Public in and for said County and State, personally appeared **ANDREW
GARDNER** who proved to me on the basis of satisfactory evidence to be the person
whose name is subscribed to the within instrument and acknowledged to me that he
executed the same in his authorized capacity, and that by his signature on the instrument
the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

**WITNESS** my hand and official seal

Signature:_____
**NOTARY PUBLIC IN AND FOR SAID COUNTY**
                                                        [ SEAL ]

Seller/Insured Initial _____
Buyer Initial _____

**STATE OF CALIFORNIA** )
                         ) **ss**
**COUNTY OF LOS ANGELES** )

      On _____ 2009, before me, _____ a Notary Public in and for said County and State, personally appeared **YVETTE GARDNER** who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

**WITNESS** my hand and official seal

Signature: _____
**NOTARY PUBLIC IN AND FOR SAID COUNTY**
                            [ SEAL ]

LESLIE KLEIN
COMM. # 1794383
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. MAR. 31, 2012

Seller/Insured Initial _____
Buyer Initial _____

**STATE OF CALIFORNIA** )
                          ) **ss**
**COUNTY OF LOS ANGELES** )

On _____ 2/6 _____ 2009, before me, ____ Leslie Klein ____ a
Notary Public in and for said County and State, personally appeared **DAVID BERGER**
who proved to me on the basis of satisfactory evidence to be the person whose name is
subscribed to the within instrument and acknowledged to me that he executed the same in
hIS authorized capacity, and that by hIS signature on the instrument the person, or the
entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

**WITNESS** my hand and official seal

Signature: _____
**NOTARY PUBLIC IN AND FOR SAID COUNTY**
[ SEAL ]

LESLIE KLEIN
COMM. # 1794383
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. MAR. 31, 2012

Seller/Insured Initial ___ ___
Buyer Initial ___ ___

**EXHIBIT "2"**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LIFE CAPITAL GROUP, LLC

A California Limited Liability Company

Dated as of June 1, 2011

# TABLE OF CONTENTS

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation................................................................................................1
Section 1.2    Name....................................................................................................1
Section 1.3    Purpose.................................................................................................1
Section 1.4    Term.....................................................................................................1
Section 1.5    Place of Business....................................................................................1
Section 1.6    Registered Office and Agency......................................................................2
Section 1.7    Fiscal Year............................................................................................2

## ARTICLE II
## MEMBERS

Section 2.1    Members................................................................................................2
Section 2.2    Company Property; Company Interest ............................................................2

## ARTICLE III
## CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts...................................2
Section 3.2    Additional Capital Contributions...................................................................2
Section 3.3    Withdrawal and Return of Capital Contributions...............................................3
Section 3.4    Interest ................................................................................................3
Section 3.5    Negative Capital Accounts .........................................................................3

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Allocation of Net Income and Net Losses.......................................................3
Section 4.2    Cash Available for Distribution....................................................................4
Section 4.3    Proceeds of Policies.................................................................................4
Section 4.4    Constructive Trust...................................................................................4
Section 4.5    Sale of Policies ......................................................................................4
Section 4.6    Lenders ................................................................................................4

## ARTICLE V
## COMPANY ACCOUNT

Section 5.1    Establishing a Reserve Account ..................................................................4
Section 5.2    Distribution of Reserve Account ..................................................................5

## ARTICLE VI
## MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1    Rights and Powers of Manager....................................................................5

i

Section 6.2    Number, Tenure and Qualifications ...................................................... 5
Section 6.3    Officers ...................................................................................................... 5
Section 6.4    Reliance ...................................................................................................... 5
Section 6.5    Indemnification of Manager, Members and Officers. ........................... 6
Section 6.6    Exculpation ................................................................................................ 7
Section 6.7    No Duties .................................................................................................... 7
Section 6.8    Protection of Insured's Private Information ......................................... 7
Section 6.9    Delivery of Policy Files ............................................................................ 7
Section 6.10   Change Forms ............................................................................................ 7
Section 6.11   Further Assurances .................................................................................. 7
Section 6.12   Indemnification of Rechnitz .................................................................... 8

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1    Representations and Warranties of Klein. ............................................. 8
Section 7.2    Representations and Warranties of Rechnitz .................................... 10

## ARTICLE VIII
## ADMISSION OF MEMBERS

Section 8.1    Admission of Members .......................................................................... 11
Section 8.2    Admission of Non-Payment Policy Members .................................... 11

## ARTICLE IX
## MAINTENANCE OF BOOKS AND RECORDS; REPORTS TO MEMBERS; TAX RETURNS

Section 9.1    Accounting Method and Records ......................................................... 12
Section 9.2    Company Records................................................................................... 12
Section 9.3    Company Reports ................................................................................... 12
Section 9.4    Designation of Tax Matters Member.................................................. 13
Section 9.5    Tax Treatment and Elections ............................................................... 13

## ARTICLE X
## TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1   Transfers and Assignments................................................................... 13
Section 10.2   Permitted Transfers................................................................................ 13
Section 10.3   Substitute Members .............................................................................. 13
Section 10.4   Right of First Refusal. .......................................................................... 14
Section 10.5   Tag-Along Rights and Obligations....................................................... 15
Section 10.6   Miscellaneous Provisions Affecting Transfer. ................................... 16

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1   Dissolution, etc ...................................................................................... 16
Section 11.2   Winding Up. ............................................................................................ 16

ii

Section 11.3  Final Distribution.............................................................................17
Section 11.4  Time for Liquidation, etc...................................................................17
Section 11.5  Termination ........................................................................................17
Section 11.6  Return of Contribution Nonrecourse to Other Members....................17

ARTICLE XII
DISPUTE RESOLUTION

Section 12.1  Rabbinical Counsel............................................................................17

ARTICLE XIII
MISCELLANEOUS

Section 13.1  Entire Agreement...............................................................................17
Section 13.2  Other Ventures...................................................................................18
Section 13.3  Amendments.......................................................................................18
Section 13.4  Choice of Law....................................................................................18
Section 13.5  Successors and Assigns; Third Party Beneficiaries............................18
Section 13.6  Interpretation.....................................................................................18
Section 13.7  Captions.............................................................................................18
Section 13.8  Severability........................................................................................18
Section 13.9  Counterparts......................................................................................19
Section 13.10 Non-Waiver .......................................................................................19
Section 13.11 Notices ...............................................................................................19

ARTICLE XIV
DEFINITIONS

Section 14.1  Definitions. ........................................................................................19

LIMITED LIABILITY COMPANY AGREEMENT of LIFE CAPITAL GROUP, LLC (this "**Agreement**"), a California limited liability company (the "**Company**"), dated as of June 1, 2011, among Shlomo Rechnitz, an individual residing in the State of California ("**Rechnitz**"), Leslie Klein, an individual residing in the State of California ("**Klein**"), and the Persons that become Members from time to time after the date hereof in accordance with the terms hereof.

## WITNESSETH:

WHEREAS, the Members desire to operate the Company as a limited liability company under Title 2.5 of the California Corporations Code, as amended from time to time (the "**Act**"), in order to accomplish certain lawful business objectives;

WHEREAS, the Certificate of Formation of Life Capital Group, LLC was filed with the Secretary of State of the State of California on April 8, 2011, in accordance with the provisions of the Act; and

WHEREAS the Members desire to set forth herein the manner in which the Company shall be governed and operated.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1    Formation. The Company was formed on April 8, 2011 by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of California. The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Act and upon and subject to the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2    Name. The name of the Company shall be Life Capital Group, LLC, under which name all business and affairs of the Company shall be conducted.

Section 1.3    Purpose. The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 1.4    Term. The term of the Company shall continue until terminated in accordance with the provisions of Article XI of this Agreement or otherwise dissolved and wound up pursuant to the Act.

Section 1.5    Place of Business. The Company shall have its principal place or places of business at such place or places as the Manager may, from time to time, select.

Section 1.6    Registered Office and Agency. The address of the registered office of the Company in the State of California is 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036. The name and address of the registered agent for service of process on the Company in the State of California is Shlomo Rechnitz, 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.

Section 1.7    Fiscal Year. The term **"Fiscal Year"** shall mean, subject to the provisions of Section 706 of the Code, each of (a) the period commencing on the date of formation of the Company and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on January 1 and ending on the Dissolution Date.

ARTICLE II
MEMBERS

Section 2.1    Members. The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof. Each initial Member shall be deemed admitted as a Member of the Company at such time as such Member has made its Initial Capital Contribution to the Company.

Section 2.2    Company Property; Company Interest. No property of the Company shall be deemed to be owned by any Member individually, but all of such property shall be owned by, and title thereto shall be vested solely in, the Company.

ARTICLE III
CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts. Each Member has contributed to the capital of the Company, as such Member's Initial Capital Contribution, the amount of cash, or property with a value, set forth on Schedule A. The Company shall maintain a record of: (a) the number of Interests held by each Member and (b) the respective Percentage Interest of each Member. The Manager shall update such Schedule A from time to time to reflect changes in such information. The Members agree that Klein's Initial Capital Contribution associated with each Policy shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. The Members agree that Rechnitz's Initial Capital Contribution associated with the Policies (in the order of each Policy that first generates proceeds) shall be deemed to be $3,800,000. The Company will establish and maintain a Capital Account for each Member throughout the full term of the Company.

Section 3.2    Additional Capital Contributions. Other than the Initial Capital Contributions made by the Members upon admission to the Company in accordance with Section 3.1 and Article VIII, the Members shall not be required to make any additional contributions to the Company; except that Rechnitz shall be obligated to contribute to the Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the Policies which are not Non-Payment Policies after the date of this Agreement and each Non-Payment Policy Member shall be obligated to contribute to the

2

Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the applicable Non-Payment Policy after the date such Non-Payment Policy Member was admitted to the Company as a Member.

Section 3.3    Withdrawal and Return of Capital Contributions.

(a)    No Member shall be entitled to demand a return of such Member's Capital Contribution (including any earnings thereon) or to withdraw any portion of such Member's Capital Account except as expressly provided in this Agreement.  Except as expressly provided herein, no Member shall have the right to demand a distribution of property other than cash for its Interest.  Each Member hereby waives any right such Member may otherwise have to cause any asset of the Company to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking the partition of any such asset.  Except as otherwise provided herein, no Member shall have priority over any other Member, either as to a return of such Member's Capital Contribution or as to Net Income, Net Losses, any other item of Company income, gain, loss or deduction, or Company distributions.

(b)    No Member shall be personally liable for the return of the Capital Contributions of any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from available Company assets, if any.

Section 3.4    Interest.  Interest, if any, earned on funds contributed or held by the Company shall inure to the benefit of the Company.  The Members shall not be entitled to receive interest or any other payments from the Company with respect to their Capital Contributions or Capital Accounts, except as otherwise provided for herein.

Section 3.5    Negative Capital Accounts.  Except as may be required by the provisions of the Act or in respect of any negative balance resulting from a withdrawal of capital or distribution in contravention of this Agreement, at no time shall any Member with a negative Capital Account balance have any obligation to the Company or the other Members to restore such negative balance, and such negative balance shall not be treated as an asset of the Company.

ARTICLE IV
DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Allocation of Net Income and Net Losses.

(a)    Net Income with respect to a Policy for any Fiscal Year shall be allocated (i) first, to Rechnitz to the extent of Rechnitz's Priority Return with respect to such Policy; (ii) second, to Rechnitz until $3,800,000 of Net Income has been allocated to Rechnitz in the aggregate (without regard to allocations of Net Income under subclause (i)); (iii) third, to Klein, to the extent of Klein's Priority Return with respect to such Policy; and (iv) thereafter, to Klein and Rechnitz in proportion to their Percentage Interests.

(b)    Net Losses with respect to a Policy for any Fiscal Year shall be allocated to Klein and Rechnitz in proportion to their Capital Contributions associated with such Policy.

3

Section 4.2    Cash Available for Distribution. Subject to Article XI, the Company shall distribute Available Cash to the Members at such times and in such amounts as determined by Rechnitz in accordance with this Agreement.

Section 4.3    Proceeds of Policies. If at any time the Company receives any proceeds from any Policy that is not a Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    first, to Rechnitz by wire transfer into an account designated by Rechnitz, in an amount up to the Rechnitz Amount for such Policy;

(b)    second, (A) first, to each of the Lenders, pro-rata, based on the outstanding principal balance owed to such Lender as set forth on Schedule C, until such outstanding principal balance is equal to zero, in an aggregate amount up to the Klein Amount for such Policy and (B) second, any remaining Klein Amount with respect to such Policy to Klein by wire transfer into an account designated by Klein;

(c)    third, (i) 50% to Rechnitz by wire transfer into an account designated by Rechnitz and (ii) 50% to Klein by wire transfer into an account designated by Klein, provided, however, that if the balance of the Reserve Account is less than $2,500,000, then proceeds distributable to Klein under clause (ii) above shall be deposited in the Reserve Account until such balance is equal to $2,500,000.

Section 4.4    Constructive Trust. If any Member receives any proceeds in respect of any Policy (following the death of an Insured or otherwise), such Member shall hold such proceeds in a constructive trust for the Company and shall within one (1) Business Day inform the other Members and the Manager and deposit such proceeds in the Reserve Account.

Section 4.5    Sale of Policies. The Company shall be entitled to sell any Policy to any Person with the prior written consent of each of the Members. Notwithstanding the immediately preceding sentence, upon Klein's written consent, Rechnitz or his designee shall be entitled to purchase any Policy that is not a Non-Payment Policy from the Company by transferring an amount equal to the Klein Amount for such Policy to the Company, which for administrative convenience shall be subsequently distributed to an account designated by Klein.

Section 4.6    Lenders. The Members agree that (i) the Company may pay amounts pursuant to Section 4.3(b) directly to the Lenders, and in such event, the payments will be treated as distributions by the Company to Klein and subsequently transferred by Klein to the Lenders, (ii) nothing herein is intended to grant to the Lenders an equity interest in the Company, and (iii) nothing herein is intended to imply that the Company is assuming the obligations owed to the Lenders.

ARTICLE V
RESERVE ACCOUNT

Section 5.1    Establishing a Reserve Account. As soon as practicable the Company shall establish the Reserve Account with the Account Bank in the name of Company.

4

Section 5.2 <u>Distribution of Reserve Account</u>. Amounts in the Reserve Account shall be distributed to certain Members in certain specified amounts under the following circumstances: (a) if the amount of Net Income allocated to Klein with respect to a Policy under Section 4.1 for a Fiscal Year exceeds the amount of proceeds distributed to Klein with respect to such Policy pursuant to Section 4.3; then 40% of such excess shall be distributed to Klein from the Reserve Account; (b) if upon a disposition of a Policy or the receipt of proceeds from such policy, the Rechnitz Amount with respect to the Policy exceeds the amount of proceeds distributed to Rechnitz with respect to such Policy pursuant to Section 4.3, then the amount of such excess shall be distributed to Rechnitz from the Reserve Account; and (c) if agreed upon by the Members, then the amount agreed upon by the Members shall be distributed to Klein from the Reserve Account.

ARTICLE VI<br>MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1 <u>Rights and Powers of Manager</u>. The business and affairs of the Company shall be managed by the Manager. The Manager shall direct, manage, and control the business of the Company to the best of the Manager's ability. Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Company's business. Nothing contained in this Agreement shall require any person to inquire into the authority of the Manager to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

Section 6.2 <u>Number, Tenure and Qualifications</u>. The Company shall have one Manager, which initially shall be Jonathon Polter ("**Polter**"), an individual residing at 2000 Town Center, Suite 1490, Southfield, Michigan 48075. Polter shall remain as the Manager unless he resigns from such position, is relieved of his duties by (i) if there are two Members or less, a unanimous vote of the Members and (ii) otherwise, an affirmative vote of Members holding a majority of the Interests. Subsequent Managers shall be elected by the affirmative vote of Members holding a majority of the Interests. Managers need not be residents of the State of California.

Section 6.3 <u>Officers</u>. The Manager may delegate the management of the Company's day-to-day business affairs to a Chief Executive Officer and other officers of the Company designated by the Manager and approved by an affirmative vote of Members holding a majority of the Interests and, unless otherwise decided by the Manager, all actions of the Company may be taken by the appropriate duly authorized officers.

Section 6.4 <u>Reliance</u>. The Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any officers, employees, or committees of the Company, or by any other Person as to matters such Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or

5

statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 6.5    Indemnification of Manager, Members and Officers.

(a)    General.    The Company shall indemnify any Person (a "**Covered Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company) by reason of the fact that he is or was a Manager, Member or officer of the Company, or is or was serving at the request of the Company as a director, manager or officer of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith with no willful misconduct or gross negligence and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.    The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)    Indemnification in Certain Cases.    To the extent that a Covered Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in clause (a) of this Section 6.5, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(c)    Advances for Expenses.    Expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Company as authorized in this Section 6.5.

(d)    Rights Non-Exclusive.    The indemnification and advancement of expenses provided by, or granted pursuant to, the other subparagraphs of this Section 6.5 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(e)    Insurance.    The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such,

6

whether or not the Company would have the power to indemnify him against such liability under the provisions of this <u>Section 6.5</u>.

(f) <u>Survival of Rights</u>. The indemnification and advancement of expenses provided by, or granted pursuant to this <u>Section 6.5</u> shall continue as to a Person who has ceased to be an officer, Manager or Member and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6 <u>Exculpation</u>. No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or its Members for any act or omission performed or omitted by such Member, Manager or officer pursuant to authority granted by this Agreement except to the extent such Person fails to meet the standard for indemnification set forth in <u>Section 6.5(a)</u>.

Section 6.7 <u>No Duties</u>. Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, <u>provided</u>, that (i) the foregoing shall not eliminate the obligation of each Member and the Manager to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied covenant of good faith and fair dealing.

Section 6.8 <u>Protection of Insured's Private Information</u>. Manager and each Member acknowledge that insurance regulations and other applicable Laws are structured to provide confidentiality to policy owners and insureds with respect to Consumer Information in connection with ownership or sale of their policies, and that the Manager and each Member and all of their respective agents and representatives, are obligated to keep Consumer Information confidential in accordance with applicable Laws. The Manager and each Member agree to comply with all applicable Laws with respect to the confidentiality of Consumer Information; <u>provided</u>, that (i) the Manager and each Member may disclose such information to their internal or external auditors and attorneys and as required or permitted by Law, and (ii) Klein may take all necessary and appropriate actions to transfer ownership of the Policies to the Company.

Section 6.9 <u>Delivery of Policy Files</u>. Klein shall deliver each Policy File as directed by the Manager within thirty (30) Business Days of the date of this Agreement.

Section 6.10 <u>Change Forms</u>. On the date of this Agreement, Klein shall execute and deliver Change Forms to the Company or at the Company's direction, changing the owner and Beneficiary of the Policy to the Company or the Company's designee. In addition, Klein shall execute and deliver any additional instruments of transfer that the Company may reasonably request necessary to evidence the assignment of the Policy and any rights therein to the Company or its designee.

Section 6.11 <u>Further Assurances</u>. From and after the date hereof, each Member shall execute and deliver such other documents and instruments, and take such further actions, as may be reasonably requested from time to time by another Member to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby. Without limiting the foregoing, Klein shall cooperate with Rechnitz in causing the Company or its designee to be

7

recorded as the owner and beneficiary of each Policy on the books and records of the relevant issuing insurance companies.

Section 6.12   Indemnification of Rechnitz.   Klein shall indemnify and hold harmless (which indemnification shall survive any termination of this Agreement and the dissolution of the Company) Rechnitz and his Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an **"Indemnified Person"**), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and actual expenses incurred (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person, and in connection with or arising out of (i) any breach of any representation, covenant or other obligation of Klein hereunder, (ii) the transactions contemplated hereunder, (iii) any actions or failures to act in connection therewith or (iv) any and all reasonable legal costs and actual expenses arising out of or incurred in connection with disputes between or among Klein and Rechnitz (collectively, **"Indemnified Liabilities"**); provided, that Klein shall not be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from that Indemnified Person's gross negligence or willful misconduct; provided, further, that the aggregate amount of Klein's liability under this Section 6.12 shall be limited to the aggregate of the Rechnitz Amounts for all of the Policies.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1   Representations and Warranties of Klein.

(a)   Power and Authority.   Klein has full power, authority and right to execute and deliver this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of its obligations hereunder.

(b)   Binding Obligation.   This Agreement constitutes the legal, valid and binding obligations of Klein enforceable against Klein in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(c)   Consent of Third Parties.   No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Klein in connection with the execution of this Agreement and the compliance by Klein with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Klein of any other action contemplated hereby.

(d)   Policies.   With respect to each Policy, to the best of Klein's knowledge:

8

(i)     at the issuance of such Policy, the related Insured or Original Owner thereof was not a party to any written or oral agreement or arrangement to cause the same or interests therein to be issued, assigned, sold, transferred, or otherwise disposed of in violation of applicable law or public policy;

(ii)     at the issuance of such Policy, the related Insured or Original Owner thereof had the financial capacity to pay the premiums necessary to maintain such Policy in force;

(iii)     at the issuance of such Policy the related Original Owner had an insurable interest in the life of the Insured;

(iv)     the material medical or financial information supplied by or on behalf of the Insured or Original Owner of such Policy in the application and related materials delivered to the applicable issuing insurance company in connection with the issuance of such Policy was not false, incomplete or misleading in any material respect;

(v)     Klein does not possess or control any material documentation or information related to such Policy, or the acquisition or maintenance thereof by Klein, that has not been delivered or disclosed in writing to Rechnitz or his agents;

(vi)     prior to the date of this Agreement and the consummation of the transactions contemplated by [insert transfer agreement title], Klein was trustee of the applicable Original Owner which held sole legal and beneficial title thereto;

(vii)     Klein, in his capacity as trustee of the applicable Original Owner, acquired sole legal and beneficial title thereto and had the power and authority to enter into this Agreement;

(viii)     Immediately prior to its transfer to the Company hereunder, Klein held sole legal and beneficial title thereto;

(ix)     upon the transfer of such Policy, Company or its designee, will hold good and marketable title to and ownership of such Policy free and clear of any liens, charges, rights, encumbrances or other interests;

(x)     such Policy was acquired in a manner in compliance, in all material respects, with the Laws applicable to the purchase of life insurance policies, as then in effect and as then interpreted by the relevant regulators or in case law;

(xi)     except as disclosed to Rechnitz in writing, no previous owner of such Policy has waived, amended or terminated any material provision of, or any material rights in relation to, such Policy;

(xii)     except as disclosed on Schedule 7.1(d)(xii), the premiums for such Policy have been paid such that such Policy will not be in a grace period as of the date of this Agreement and such Policy has not been cancelled as of the date of this Agreement;

(xiii)   Klein has disclosed or delivered to Rechnitz and the Company in writing all information received by Klein or any of his agents from the related issuing insurance company related to any change in the terms of such Policy, including with respect to an intent to increase the cost of insurance for such Policy;

(xiv)   there is no current or pending written notice that has been issued to Klein by the related issuing insurance company of such issuing insurance company's intention to cancel, contest, rescind or refuse payment under such Policy;

(xv)   all the information contained in each of the documents in the related Policy File or otherwise delivered by or on behalf of Klein to the Company and Rechnitz in connection with such Policy is true, complete and correct in all material respects;

(xvi)   the related Policy File contains the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

(xvii)   there is not any pending or threatened Proceeding challenging the validity, ownership or enforceability of such Policy or Klein's ownership rights in such Policy;

(xviii)   such Policy was not issued pursuant to or in connection with an agreement whereby the premiums required to be paid on such Policy were paid by any Person pursuant to a recourse or non-recourse premium financing program;

(xix)   Klein has not required any broker to sign an agreement offering Klein or any other Person the "right of last offer" in connection with the purchase of such Policy; and

(xx)   such Policy has been issued by the related issuing insurance company and is in force and any related contestability period and any suicide exclusion period has expired.

Section 7.2   <u>Representations and Warranties of Rechnitz</u>. Rechnitz hereby represents and warrants that:

(i)   <u>Authority</u>. Rechnitz has full power, authority and right to execute this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of his obligations hereunder.

(ii)   <u>Binding Obligation</u>. This Agreement constitutes Rechnitz's legal, valid and binding obligation, enforceable against Rechnitz in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(iii)   <u>Consent of Third Parties</u>. No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or

Governmental Authority is required by Rechnitz in connection with the execution of this Agreement and the compliance by Rechnitz with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Rechnitz of any other action contemplated hereby.

ARTICLE VIII
ADMISSION OF MEMBERS

Section 8.1    Admission of Members.   Subject to Section 8.2, upon the approval of the Members by majority vote, one or more Persons may be admitted to the Company as Members. The Members by majority vote shall determine the number of Interests and the Percentage Interest to be offered to any such Member and the Initial Capital Contribution to be made by any such Member.  Each such Person shall be admitted as a Member at the time such Person (a) executes and delivers a copy of this Agreement to the Manager and (b) if applicable, makes its Initial Capital Contribution to the Company.  The Manager shall update Schedule A to reflect the admission of any such Members.

Section 8.2    Admission of Non-Payment Policy Members.    It is agreed and acknowledged by the Members that Rechnitz's sole obligation with respect to the Company is making Capital Contributions for the payment of premiums on the Policies and the expenses associated with the Policies, in each case after the date of this Agreement.  Rechnitz shall provide the Company and Klein with six (6) months prior written notice if Rechnitz elects to cease paying premiums in respect of any Policy (such Policy, a "**Non-Payment Policy**").  After delivery of such notice, Rechnitz or Klein shall have the right to introduce any Person to the Company as a potential Member who agrees in writing to assume Rechnitz's obligations for the payment of premiums and other costs and expenses with respect to such Non-Payment Policy, which person shall be admitted as a Member upon the approval of the Members by [majority] vote (such a Member, a "**Non-Payment Policy Member**").  With respect to any Non-Payment Policy, any payment of premiums and other costs and expenses shall be contributed to the capital of the Company by the applicable Non-Payment Policy Member.  If at any time the Company receives any proceeds from any Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)    First, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount up to (x) the total amount of Capital Contributions made on such Policy by such Non-Payment Policy Member and (y) the Priority Return of such Non-Payment Policy Member on such Policy computed starting on the date such Non-Payment Policy Member was admitted as a Member;

(b)    Second, by wire transfer into an account designated by Rechnitz, in an amount equal to the Rechnitz Amount for such Policy;

(c)    Third, by wire transfer into an account designated by Klein, in an amount equal to the Klein Amount for such Policy;

11

(d)     Fourth, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount equal to fifty percent (50%) of all remaining proceeds from such Policy;

(e)     Fifth, to Rechnitz and Klein by wire transfers into accounts respectively designated by them in proportion to the Capital Contributions made by them with respect to each such Non-Payment Member Policy; provided, however that if Klein introduced the related Non-Payment Policy Member to the Company, then 25% of the amount distributable under this clause (e) to Rechnitz shall be distributed to Klein instead.

Notwithstanding Section 4.1 hereof, Net Income associated with a Non-Payment Policy shall be allocated to each Member to the extent of any Priority Return distributed to such Member with respect to the Non-Payment Policy and to the extent of any distributions made to a Member pursuant to Section 8.2(d) or Section 8.2(e) above with respect to such Non-Payment Policy . Notwithstanding Section 4.1 hereof, Net Losses associated with a Non-Payment Policy shall be allocated to each Member in proportion to the Capital Contributions made by such Member with respect to such Non-Payment Policy.

ARTICLE IX
MAINTENANCE OF BOOKS AND RECORDS;
REPORTS TO MEMBERS; TAX RETURNS

Section 9.1     <u>Accounting Method and Records</u>.     Rechnitz shall determine the accounting method to be used by the Company.  The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Section 9.2     <u>Company Records</u>.  The Company shall maintain the following records, within or outside the State of California: (a) a copy of the Company's accounting records and federal, state, local and foreign income tax or information returns and reports, if any, for the five most recent Fiscal Years; and (b) all other records and reports required by the Act or otherwise to be maintained by the Company.   Each Member, and such Member's duly authorized representatives or agents, shall, for any purpose reasonably related to his interest as a Member, have reasonable access to such books and records at such office and shall have the right to inspect and copy such books and records; provided, however, that if a Member was an officer, consultant or employee of the Company received his/her Interest pursuant to a profits interests grant agreement ceases to be an employee, consultant or officer of the Company, such Member shall only have the right to receive books and records that he/she has the right to require the Company to provide to him/her in accordance with applicable law.

Section 9.3     <u>Company Reports</u>.  The Company shall cause to be furnished to each Member and each other Person who was a Member during the period in question (a) such reports and financial statements as may be reasonably required for his financial reporting requirements, including, without limitation, copies of all annual, quarterly and monthly financial statements, and (b) detailed financial statements and information and documents (including Form K-1) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

12

Section 9.4    Designation of Tax Matters Member.  Rechnitz is designated the "**Tax Matters Member**" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

Section 9.5    Tax Treatment and Elections.  The Company shall be treated as a partnership for federal income tax purposes, the Members shall be treated as partners for federal income tax purposes, and each of the Members agrees to report consistently with such treatment. The Manager shall make all elections necessary to give effect to such treatment.

ARTICLE X
TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1    Transfers and Assignments.

(a)    No Member shall be permitted to Transfer any Interest to a Person other than a Permitted Transferee, except in accordance with the provisions set forth in this Article X.

Section 10.2    Permitted Transfers.

(a)    Each Member shall notify the Manager and the other Members of any proposed Transfer to a Permitted Transferee by such Member, or by any of its Affiliates, in the case of an indirect Transfer of an Interest, which notice shall set forth the name and address of the Permitted Transferee and the nature of the relationship between such Member and such Permitted Transferee, at least ten (10) calendar days prior to the proposed date of such Transfer. Each Member shall be responsible for paying all transfer, gains or similar taxes, if any, and all reasonable costs and expenses of the Company, including reasonable attorneys' fees, arising out of any Transfer by such Member of all or a portion of its Interest (or by any of its Affiliates in the case of an indirect Transfer of an Interest) to a Permitted Transferee.  As a condition to any Transfer of all or any portion of an Interest in the Company to a Permitted Transferee shall execute and deliver to the Company a joinder agreement, in form of Exhibit A (a "**Joinder Agreement**"). All of the provisions of this Agreement, including without limitation, the provisions of this Article X, shall be applicable to and binding upon each Permitted Transferee.

(b)    The transfer by a Member of all or any portion of its Interest (including, without limitation, any transfer to a Permitted Transferee) shall not release such Member from any or all of its obligations under this Agreement arising prior to the date of such Transfer.

Section 10.3    Substitute Members.  A Permitted Transferee of the Interest of a Member or a transferee of the Interest of a Member pursuant to Sections 10.4 and 10.5 of this Agreement, or any portion thereof, shall become a substitute Member entitled to all the rights, and subject to all of the obligations and restrictions, of the transferor Member if, and only if:

(a)    the transferor assigns the transferee such right;

13

(b)     the transferor or transferee pays to the Company all reasonable costs and expenses incurred by the Company in connection with such substitution; and

(c)     the transferee executes and delivers a Joinder Agreement.

Section 10.4   <u>Right of First Refusal</u>.

(a)     Except for Transfers pursuant to or contemplated by <u>Section 10.2</u>, if any Member (a "**Selling Member**") receives a bona fide written offer from an independent third party (a "**Third Party**") to purchase any or all of such Selling Member's Interests for cash and such Selling Member desires to Transfer any or all of such Interests (the "**Offered Interests**") pursuant to such offer, prior to any Transfer it shall give written notice of the proposed Transfer (the "**Notice of Intention**") to the Company and the other Members (the "**Remaining Members**") specifying the number of Offered Interests which such Selling Member wishes to Transfer, the proposed transferee, the proposed purchase price for the Offered Interests (the "**Offer Price**") and the other material terms and conditions of the proposed Transfer.

(b)     For a period of thirty (30) days after receipt of the Notice of Intention (the "**Option Period**"), each of the Remaining Members shall have the irrevocable option to purchase at the Offer Price and on the other terms specified in the Notice of Intention, all of the Offered Interests <u>pro</u> <u>rata</u> based on the Percentage Interest of each Remaining Member; provided, however, that if any Remaining Member does not purchase any or all of its <u>pro</u> <u>rata</u> portion of such Offered Interests, the other Remaining Members shall have the right to purchase such portion, <u>pro</u> <u>rata</u>, until all of such Offered Interests are purchased.  The option of a Remaining Member pursuant to this <u>Section 10.4(b)</u> (the "**Remaining Members Option**") shall be exercisable by delivery of a notice (the "**Remaining Members Notice**") setting forth the maximum number of Offered Interests that such Remaining Member wishes to purchase, including any number which would be allocated to such Remaining Member if any other Remaining Member does not purchase all or any portion of its <u>pro</u> <u>rata</u> portion, to the Selling Member, the Company and the other Remaining Members and shall expire if the Remaining Members Notice is not delivered prior to the expiration of the Option Period.

(c)     If all notices required to be given pursuant to this <u>Section 10.4</u> have been duly given, and the Remaining Members determine not to exercise their respective options to purchase all of the Offered Interests at the Offer Price and on the other terms specified in the Notice of Intention or determine, with the consent of the Selling Member, to exercise their options to purchase less than all of the Offered Interests, then the Selling Member shall have the right, for a period of ninety (90) days from the earlier of (a) the expiration of the Option Period and (b) the date on which such Selling Member receives notice from the Remaining Members that they will not exercise the option granted pursuant to this <u>Section 10.4</u>, to accept the bona fide offer from the Third Party and enter into an agreement to sell the Offered Interests remaining unsold under this <u>Section 10.4</u> at a price not less than the Offer Price and on the same terms as set forth in the Notice of Intention; provided that prior to any such Transfer to a Third Party, such Third Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby becomes a party to this Agreement.

14

(d)    The closing of any purchase and sale of any Interests to a Remaining Member pursuant to this Section 10.4 shall take place at the offices of the Company on such date, not later than sixty (60) days after the delivery to the Selling Member of the Remaining Members Notice. At the closing of such purchase and sale, the Secretary or such other officer of the Company shall record such Transfer in the books of the Company against evidence of such Transfer, delivery of the Offer Price therefor and an executed Joinder Agreement.

(e)    If the Remaining Members Option is not exercised, and the Offered Interests are not sold pursuant to Section 10.4(c) within the ninety (90) day period referred to therein, such sale may not be carried out without complying again with the terms of this Section 10.4.

Section 10.5    Tag-Along Rights and Obligations.

(a)    In the event that after complying with the terms of Section 10.4, the Selling Member desires to sell (the "**Disposition**") the Offered Securities to a Third Person (the "**Acquirer**"), the Selling Member's right to accept such offer to purchase the Offered Securities shall be conditioned on each Remaining Member being offered the right to sell to the Acquirer its pro rata portion of the Offered Securities (based on the Percentage Interest of each Remaining Member) in such Disposition in accordance with this Section 10.5. The Selling Member shall give notice (the "**Disposition Notice**") to each Remaining Member at least thirty (30) days prior to the consummation of the Disposition specifying the number of Offered Interests which such Selling Member wishes to Transfer in the proposed Disposition, the proposed transferee, the proposed purchase price for the Offered Interests and the other material terms and conditions of the proposed Disposition.

(b)    The election to participate in the Disposition by the Remaining Members pursuant to Section 10.5(a) shall be exercised by notice to the Selling Member given within the time period specified in the Disposition Notice, which time period shall not be less than fifteen (15) days after such Disposition Notice is given. If any Remaining Member gives notice of its election to sell, it shall be obligated to sell the number of Interests specified in such Remaining Member's notice upon the terms and subject to the conditions specified in Section 10.5(a) to the Acquirer (which shall be the same for the other Remaining Members and the Selling Member), conditional upon the closing of the Disposition.

(c)    The sale or Transfer of Interests to the Acquirer by the Selling Member and by the Remaining Members electing to participate in the Disposition pursuant to this Section 10.5 shall occur simultaneously and be on the same terms and at the same price as the Interests sold by the Selling Member; provided that prior to any such Transfer to an Acquirer, such Acquirer shall execute and deliver to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby become a party to this Agreement.

(d)    If the Acquirer declines to purchase from such Remaining Members their respective proportionate number of Interests calculated in accordance with this Section 10.5, the Selling Member will not sell any Interests to the Acquirer.

15

Section 10.6    Miscellaneous Provisions Affecting Transfer.

(a)    Upon the Transfer of all or any portion of a Member's Interests as permitted or required under this Agreement, including, without limitation, as provided in this Article X, (i) the income, loss, gain, deduction and credit attributable to the Interests so transferred shall be allocated between the transferor and transferee based upon the number of days during the applicable Fiscal Year that the Interests so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided that the Manager shall, at the request and expense of the transferring Member, cause an interim closing of the Company's books as of the effective date of Transfer for purposes of allocating such items between the transferor and transferee; and (ii) the transferor shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods preceding the date of Transfer, and the transferee shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods on and after the date of Transfer based upon the number of days during the applicable Fiscal Year that the Interests so transferred were held by each of them, without regard to the results of Company activities during the period in which each was the holder.

(b)    The Company shall be entitled to treat the record owner of any Interests as the absolute owner thereof, and shall incur no liability for distributions of cash or other property or allocations of income, gain, loss, deduction or credit made in good faith to such owner until such time as a written assignment of such Interests has been received, accepted and recorded on the books of the Company.

ARTICLE XI
DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1    Dissolution, etc.  The Company shall be dissolved upon the occurrence of any of the following events (the date of such occurrence, the "**Dissolution Date**"):

(a)    As approved by the majority vote of the Members; or

(b)    As otherwise required by applicable law.

Section 11.2    Winding Up.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.  The Manager shall immediately proceed to wind up the affairs of the Company in accordance with this Section 11.2.

(b)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be

16

considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

        (c)     The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3   <u>Final Distribution</u>. After the application or distribution of the proceeds of the liquidation of the Company's assets in one or more installments to the satisfaction of the liabilities to creditors of the Company, including to the satisfaction of the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof), the remaining proceeds, if any, plus any remaining assets of the Company shall be distributed to the Members in accordance with Sections 4.3 and 8.2, as applicable.

Section 11.4   <u>Time for Liquidation, etc</u>. A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the certificate with the Secretary of State of the State of California.

Section 11.5   <u>Termination</u>. Upon completion of the winding up of the Company, the Manager (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of California. Upon the cancellation of the Certificate, this Agreement and the Company shall terminate.

Section 11.6   <u>Return of Contribution Nonrecourse to Other Members</u>. Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

ARTICLE XII

DISPUTE RESOLUTION

Section 12.1   <u>Rabbinical Counsel</u>. If any dispute arises between the Members regarding this Agreement or any provision hereof, that dispute shall be resolved through a binding arbitration proceeding to be conducted in the State of California in accordance with the commercial arbitration rules of the Rabbinical Council of California.

ARTICLE XIII

MISCELLANEOUS

Section 13.1   <u>Entire Agreement</u>. This Agreement, taken together with the other documents expressly referred to herein, each as amended or supplemented, constitutes the entire

17

agreement among the parties with respect to the subject matter herein or therein and supersedes any prior agreement or understanding among the parties hereto.

Section 13.2   Other Ventures. The Manager or any Member, and any firm, corporation or association with which the Manager or any Member is in any way interested or connected, may act as attorney for, deal and contract with, and be employed by the Company, and the Manager or any Member may be, in any manner, interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same freedom as though not a Manager or a Member, as the case may be, and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable.

Section 13.3   Amendments. This Agreement may be amended only with the written consent of a Majority in Interest; provided that any such amendment that materially adversely affects the rights and privileges of any Member (other than any amendment effected in connection with the making of a Capital Contribution to the Company by, and/or the issuance of additional Interests to, any Member, including, without limitation, any amendment to the rights and privileges of the Interests to reflect dilution resulting from such Capital Contributions or issuance of additional Interests) must be consented to by each of the Members so affected[; provided further, that any amendment to this Agreement shall not be effective without the consent of Rechnitz].

Section 13.4   Choice of Law. This Agreement shall be construed in accordance with the laws of the State of California, without regard to the choice of laws rules thereof, and the obligations, rights and remedies of the Members hereunder shall be determined in accordance with such laws.

Section 13.5   Successors and Assigns; Third Party Beneficiaries. This Agreement shall be binding upon, and, subject to Article X, shall inure to the benefit of, the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns. Except as otherwise expressly provided herein, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto.

Section 13.6   Interpretation. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

Section 13.7   Captions. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

Section 13.8   Severability. If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

18

Section 13.9    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.10  Non-Waiver.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred; provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Section 13.11  Notices.  All notices, requests, demands, claims and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by confirmed facsimile with a copy sent by another means specified herein; the business day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five business days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

>     if to the Company:
>
>     c/o Shlomo Rechnitz
>         5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.
>
>
>     with a copy to:
>
>     Leslie Klein
>     14245 Ventura Blvd., Sherman Oaks, CA 91423

and if to a Member, to the Member's address or facsimile number on the books records of the Company, or to such other address with respect to the Company or a Member as the Company or such Member, as applicable, notifies the Company and the other Members in writing as provided above.

ARTICLE XIV
DEFINITIONS

Section 14.1    Definitions.

References in this Agreement to an "**Exhibit**" are intended to refer, unless otherwise specified, to an Exhibit attached to this Agreement, and references in this Agreement to an "**Article**" or a "**Section**" are intended to refer, unless otherwise specified, to an Article or a Section of this Agreement.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

19

"**Account Bank**" means PrivateBancorp, Inc.

"**Act**" shall have the meaning specified in the recitals to this Agreement.

"**Affiliate**" means any Person that, directly or indirectly, through one or more intermediaries, is Controlled by one or more Members. As used in this definition, "Control" means either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as the same may be amended hereafter from time to time as provided herein.

"**Available Cash**" means, at the time of determination, cash generated from revenues from the Company's operations, after provision has been made for (a) all expenditures paid or to be paid by the Company to non-Members and (b) such amounts as the Manager, in his sole discretion, shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company. Available Cash shall be determined without regard to (i) Capital Contributions and (ii) principal advanced on Company indebtedness.

"**Beneficiary**" means, with respect to the Policy, the legal person or persons designated as the recipients of the Death Benefit for such Policy.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member by crediting such Member's Capital Contributions, such Member's share of Net Income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member) and by debiting the amount of cash and the gross fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), such Member's share of Net Losses, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial gross fair market value of any property contributed (or deemed contributed) from time to time by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject). The initial gross fair market value of each Policy contributed by Klein shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made

20

by any predecessor of a Member. For purposes of this Agreement, a Capital Contribution shall include, without limitation, any Initial Capital Contribution.

"**Certificate**" has the meaning set forth in Section 1.1.

"**Change Forms**" means the forms changing the owner and Beneficiary of the Policy using such form as is required by each of the relevant issuing insurance companies.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as the same may be amended hereafter from time to time.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consumer Information**" means medical, health, financial and personal information about an Insured, an Original Owner, a Beneficiary under a Policy or a person designated by an Insured to provide periodic information regarding the medical status of the Insured, or any spouse or other individual closely related by blood or law to any such person (each, a "**Consumer**"), including, without, limitation, a Consumer's name, street or mailing address, email address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document such as a Policy, life expectancy evaluation, life insurance application or life settlement application).

"**Covered Person**" shall have the meaning specified in Section 6.5(a).

"**Death Benefit**" means the cash amount of a Policy to be paid upon the death of the applicable Insured under such Policy, which amount will be net of any policy loans made under such Policy (and accrued interest thereon).

"**Disposition**" shall have the meaning specified in Section 10.5(a).

"**Disposition Notice**" shall have the meaning specified in Section 10.5(a).

"**Dissolution Date**" shall have the meaning specified in Section 11.1.

"**Fiscal Period**" means, subject to the provisions of Section 706 of the Code, (i) any Fiscal Year and (ii) any portion of a Fiscal Year for which the Company is required to allocate Net Income, Net Losses or other items of Company income, gain, loss or deduction pursuant to Article IV.

"**Fiscal Year**" shall have the meaning specified in Section 1.7.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Liabilities**" shall have the meaning specified in Section 6.12.

21

"**Indemnified Person**" shall have the meaning specified in Section 6.12.

"**Initial Capital Contribution**" means, with respect to each Member, such Member's Initial Capital Contribution set forth on Schedule A.

"**Insured**" means, with respect to a Policy, each person whose life is insured under such Policy.

"**Interest**" means, with respect to any Member, (a) such Member's share of the profits and losses of the Company and a Member's rights to receive distributions from the Company in accordance with the provisions of this Agreement and the Act and (b) such Member's other rights and privileges in respect of the Company as herein provided.

"**Joinder Agreement**" shall have the meaning specified in Section 10.2(a).

"**Klein Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy.

"**Law**" means any law, constitution, statute, ordinance, code, rule, regulation, decision, order, consent, decree, judgment, ordinance, release, license, permit, stipulation or other pronouncement having the effect of law enacted or issued by any Governmental Authority, any foreign country, or domestic or foreign state, country, city or other political subdivision, which includes binding judicial precedent and principles of common law.

"**Lender**" shall mean each lender identified on Schedule C.

"**Majority in Interest**" means Members that at the time in question together hold a Percentage Interest greater than 50% in the aggregate.

"**Manager**" means one or more persons designated as such pursuant to this Agreement.

"**Members**" means, collectively, the members signatory to this Agreement, and any other Persons admitted to the Company as members after the date hereof in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Losses**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss and each item of income, gain, expense, deduction and loss shall be allocable to the Members in accordance herewith).

"**Non-Payment Policy**" shall have the meaning as specified in Section 8.2.

"**Non-Payment Policy Member**" shall have the meaning as specified in Section 8.2.

"**Notice of Intention**" shall have the meaning as specified in Section 10.4(a).

"**Offer Price**" shall have the meaning as specified in Section 10.4(a).

"**Offered Interests**" shall have the meaning specified in Section 10.4(a).

"**Option Period**" shall have the meaning as specified in Section 10.4(b)

"**Original Owner**" means, with respect to a Policy, the Person to which the Policy was initially issued and who was listed as owner on the initial declarations page of such Policy or the policy application, as applicable.

"**Percentage Interest**" means, with respect to any Member as of any date of determination, a fraction (expressed as a percentage) having as its numerator the aggregate number of Interests held by such Member at such time, and having as its denominator the aggregate number of Interests held by all Members at such time. Each Member's Percentage Interest as of the date hereof, and as adjusted from time to time, is set forth on Schedule A.

"**Permitted Transferee**" means (a) with respect to any Member who is an individual, such member's siblings, parents, spouse (former spouse, if any), and children, and trusts solely for the benefit of any of the foregoing, and (b) with respect to any Member that is an entity, an Affiliate of such Member. [**Anyone else?**]

"**Person**" means any individual or any corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

"**Policy**" means each of the life insurance policies contributed to the capital of the Company by Klein, as specified in Schedule B hereto.

"**Policy File**" means, with respect to a Policy, the file relating to such Policy which file shall include, without limitation, the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

"**Policy Illustration**" means, with respect to a Policy, a policy illustration from the related issuing insurance company.

"**Polter**" shall have the meaning set forth in Section 6.2.

"**Priority Return**" of a Member with respect to any Policy shall mean an annual rate of return of 12% on the total amount of Capital Contributions made by a Member with respect to such Policy from the date such Capital Contribution were made but computed no earlier than from the date of this Agreement. .

"**Rechnitz Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Rechnitz related to such Policy and (y) the Priority Return for Rechnitz on such Policy.

"**Remaining Members**" shall have the meaning specified in <u>Section 10.4(a)</u>.

"**Remaining Members Notice**" shall have the meaning specified in <u>Section 10.4(b)</u>.

"**Remaining Members Option**" shall have the meaning specified in <u>Section 10.4(b)</u>.

"**Reserve Account**" means account number [____] established at Account Bank.

"**Selling Member**" shall have the meaning specified in <u>Section 10.4(a)</u>.

"**Third Party**" shall have the meaning as specified in <u>Section 10.4(a)</u>.

"**Transfer**" means, as a noun, any voluntary or involuntary, and direct or indirect, assignment, transfer, pledge, syndication, sale, hypothecation, contribution, encumbrance or other disposition or purported disposition, and, as a verb, voluntarily or involuntarily, and directly or indirectly, to assign, transfer, pledge, syndicate, sell, hypothecate, contribute, encumber or otherwise dispose of.

"**Tax Matters Member**" shall have the meaning specified in <u>Section 9.4.</u>

"**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code, as the same may be amended hereafter from time to time.

*[Remainder of Page Intentionally Left Blank]*

24

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability
Company Agreement as of the date first set forth above.

SHLOMO RECHNITZ

_____

LESLIE KLEIN

_____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

4929 Wilshire Boulevard, Suite 940, Los Angeles, California 90010.

A true and correct copy of the foregoing document entitled: **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT UNDER LBR 7055-1** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 12/19/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Baruch C Cohen (PL)          bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
Michael I. Gottfried (IP)       mgottfried@elkinskalt.com, cavila@elkinskalt.com, lwageman@elkinskalt.com, docketing@elkinskalt.com
Nikko Salvatore Stevens (IP)  nikko@cym.law, mandi@cym.law
Clarisse Young (IP)         youngshumaker@smcounsel.com, levern@smcounsel.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On 12/19/2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Leslie Klein, 322 N. June Street, Los Angeles, CA 90001

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (<u>state method for each person or entity served</u>):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 12/19/2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Sandra R. Klein, 255 E. Temple Street, Suite 1582, Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/19/2023 | Baruch C. Cohen, Esq. | /s/ Baruch C. Cohen |
|---|---|---|
| Date | Printed Name | Signature |